[Crim. No. 5730. Second Dist., Div. One. Nov. 26, 1957.]

THE PEOPLE, Respondent, v. CHARLES L. ARENDS, Appellant.

498

D. LaVelle Nickerson, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County containing seven counts, defendants were accused in each count of the crime of grand theft of money from California Rubber Products, Inc., a corporation. Defendants pleaded not guilty as to each count. Defendant Arends' motion to dismiss under Penal Code, section 1382, was denied, as was his motion for a severance of his trial from that of his codefendant. Trial by jury resulted in verdicts finding defendant Stiller not guilty on each count, and defendant Arends guilty on all counts. The latter's motion for a new trial was denied, as was his application for probation, and he was sentenced to state prison on each count, the sentences to run concurrently. From the judgment of conviction, the order denying his motion for a new trial, and from the "imposition of sentence," defendant Arends prosecutes this appeal.

With regard to the factual background surrounding this prosecution the record reveals that California Rubber Products, Inc. was a corporation engaged in the manufacture of rubber products from various raw materials, including crude rubber and other synthetics, but not a product called

GNA Neoprene, a synthetic rubber substance manufactured by E. I. duPont de Nemours and Company (hereinafter referred to as duPont Company). This latter product was purchased from purveyors thereof.

William E. Shawger was President and General Manager of California Rubber Products, Inc., in 1954 and 1955. Miss Viola Burger was Secretary and Treasurer of the corporation, worked in the office thereof and handled the purchase orders. Appellant Arends was the factory superintendent of the rubber shop and in complete charge of the rubber manufacturing. Ordinarily, in handling the purchase orders, Miss Burger would receive information from the shop superintendent (appellant) on a requisition sheet, that certain crude materials were needed. From the information on the requisition she would prepare a purchase order, each of which was numbered, and put the number of the purchase order on the requisition. Then she would telephone to the purveyors of the crude material and give them the purchase order number, send them the confirming order, and put a copy of the order on Mr. Shawger's desk. After the material had been picked up or shipped, along with a bill of lading, the purveyors would send a bill to California Rubber Products. The bills were checked with the bills of lading which had accompanied the materials, and when the amounts were verified, the bills would be put aside to be paid. At the time they were paid, Miss Burger would make out a check on a California Rubber Products form, and sign it. The checks, along with the bills for which they were payment, would be put on Mr. Shawger's desk for his signature. After he signed them, always without looking at the invoices, Miss Burger would send them to the appropriate purveyor. Mr. Shawger had no recollection of having seen a purchase order for GNA Neoprene go across his desk during the six years preceding February 27, 1956, and he used none during that period. There were times when the appellant would call Miss Burger and ask her for a purchase order number, saying that he had the supplier on the telephone and wanted to give him the order number. In those instances Miss Burger would give him a number, put aside the purchase order form carrying that number, and when the requisition came to her she would type up the purchase order and mail a confirming order. She would not make out a pick-up slip for the California Rubber Products truck driver to get the material in those cases, as she usually did.

Mr. Shawger was acquainted with defendant Stiller, and saw him at California Rubber Products occasionally when he came to visit with the appellant. Mr. Shawger never gave Stiller permission to take any raw material or any products of the California Rubber Products for his own use, or to buy or receive any crude material from the suppliers to the California Rubber Products Company and have the materials charged to the California Rubber Products Company. Specifically, he did not give Stiller permission on or about December 15, 1954, January 19, 1955, February 21, 1955, March 15, 1955, April 6, 1955, May 27, 1955, or August 5, 1955, the dates charged in the information, or any time at all, to receive from the duPont Company 3,000 pounds of GNA Neoprene and charge it to the California Rubber Products Company. He never gave one Albus, hereinafter referred to, permission to go to any of his suppliers of material and receive from them any material and have that material charged to the California Rubber Products Company. Mr. Shawger did not on or about December 15, 1954, January 19, 1955, February 21, 1955, March 15, 1955, April 6, 1955, May 27, 1955 or August 5, 1955, give the appellant permission or authority to order, charge to California Rubber Products Company, or receive, 3,000 pounds of GNA Neoprene from duPont for his own personal use.

Illustrative of the methods used by appellant in the transactions upon which the charges contained in the seven counts were grounded is the following résumé of the evidentiary features of Count I of the information. On December 15, 1954, Miss Burger received from the appellant a requisition calling for 3,000 pounds of "GN.A NeoP." It had the signature of the appellant in the space marked "Approved," "duPont" in the corner, and "7849" in the appellant's writing in the space for the "P.O. No." Miss Burger made up a purchase order No. 7849, referred to on the requisition, dated it December 20, 1954, signed it, and put "confirmed" on it, indicating that the order had been telephoned to duPont.

DuPont issued a bill of lading, which would accompany the delivery of the product which had been purchased from duPont, addressed to California Rubber Products Company, on which appeared "Customer Order No. 7849," the purchase order of California Rubber Products Company. An invoice was received by the California Rubber Products Company from duPont, and it included on it the notation

that it was for "Customer Order No. 7849," for Neoprene type GNA, for $1,299.60. The amount of this invoice was included in a check to duPont from the California Rubber Products Company dated January 31, 1955.

Paul Albus, who worked for the Montebello Rubber Company, and worked sometimes for Custom Rubber Products, which was owned by Stiller and the appellant, was given a purchase order number by Stiller, who said that it covered 3,000 pounds of GNA billed to California, and was told by him to go to duPont, pick up the Neoprene, and deliver it not to California, but to Custom. Albus got a truck which was available and went to duPont, where he gave them the purchase order number which he had been given, and got the GNA Neoprene and a bill of lading. He then took it to Custom and unloaded it. It stayed there for a few days.

In December of 1954, Mr. Snow, secretary of the Fullerton Manufacturing Corporation, manufacturers of molded rubber products primarily for the oil fields, received a telephone call from defendant Stiller, who had been connected with that company, in which Stiller asked him if he was using Neoprene. Mr. Snow said that he was, and Stiller said that he had some on hand, and asked if Mr. Snow could take it off his hands. Mr. Snow told him that he could if it was fresh. Stiller told him to send the driver up and he would give him a sample bag. Mr. Snow did, and found the material to be good, so he bought it. The company had theretofore bought GNA Neoprene from duPont for 44 cents a pound, and defendant Stiller sold it for 40 cents a pound. One or two days after the conversation, Mr. Snow sent his truck driver, Roy Todd, along with a check for $1,230 made payable to Stiller, to pick up the GNA Neoprene. Todd went to Custom Rubber, gave the check to Albus, who had been told by Stiller that Fullerton Manufacturing would pick up the Neoprene and leave a check, and took the Neoprene back to the Fullerton Manufacturing Company. Albus gave the check to Stiller.

Markings on the check showed that it was endorsed with the name of A. P. Stiller and cashed on December 21st, by the same person at the Eastern-Sheila Branch of the Citizens National Bank. The records of the Hawthorne Branch of the Bank of America showed that on December 23, 1954, a deposit of $500 in fifty dollar bills was deposited in that bank to the account of C. L. Arends, appellant herein.

Except for dates and amounts of money involved, the

foregoing may be regarded as a fair epitome of the factual situation prevailing as to Counts II, III, IV, V and VI.

Since the facts upon which Count VII was based led to the apprehension of both defendants, we shall here narrate them in detail. Mr. Jordan, an employee of duPont, and Mr. Shawger, President and General Manager of California Rubber Products, met at a social gathering on July 19, 1955. Mr. Shawger mentioned that Miss Burger, his purchasing agent, was no longer with him because of irregularities that were found. Mr. Jordan asked Mr. Shawger what he was doing with all of the GNA Neoprene. Mr. Shawger told him that they didn't use any. Mr. Jordan then said that Mr. Shawger had used 18,000 pounds in the last six months. The next morning Mr. Shawger started to check into it at California Rubber, and thereafter notified the district attorney's office. He spoke to Mr. Drebin, Mr. Hawkins and Mr. Terry from that office. About two weeks later the appellant told Mr. Shawger that they had a large order for Neoprene and he would have to get some right away. Mr. Shawger told him to put in his requisition and order it. A requisition in the appellant's handwriting, was prepared. A California Rubber Products Company purchase order was prepared from the requisition. The order was telephoned in. Mr. Shawger got in touch with duPont and the district attorney's office.

Stiller instructed Albus to go to duPont and pick up 3,000 pounds of GNA under a certain California purchase order number, which he wrote on a piece of paper. Albus got a truck and went to duPont, where he told the shipping and receiving clerk that he would like to pick up 3,000 pounds of GNA under the California purchase order number. He got it, along with a bill of lading. After it was loaded on the truck, he took the Neoprene to Custom Rubber and unloaded it. He returned the truck, and was stopped by Mr. Hawkins and Mr. Terry from the district attorney's office.

Appellant did not testify as a witness in his own behalf, resting his defense on the testimony of character witnesses who attested to his good reputation for truth, honesty and integrity, and witnesses who testified that the general reputation of Mr. Shawger, President and General Manager of California Rubber Products Company for the same qualities "around California Rubber" was bad.

Defendant Stiller called as a witness in his own behalf,

testified that Custom Rubber was a partnership and that he and appellant were partners therein. That he was also a part owner of Custom Rubber Products. That he was acquainted with appellant for some 22 years, and that he relied, depended upon, and trusted appellant.

That in the early part of December, 1954, appellant telephoned the witness and told him that he could buy some Neoprene at an attractive price, which was 28 cents a pound in 3,000 pound lots. Stiller said that he didn't think they could afford to buy it. The appellant told him to think it over. Three or four days later Stiller telephoned to the appellant and asked him if he had any of a certain stock which he needed. The appellant said that they had it, and Stiller ordered a small batch. The appellant said he could fix him up with it in the next day or two, and then asked Stiller if he had given the Neoprene GNA any further thought. Stiller said that they didn't have the money and didn't need it at Custom at that time. A day or two later the appellant called Stiller and said that he had the stock he wanted, and Stiller said that he would arrange to have Paul Albus, who worked for Custom, pick it up. The appellant said that the man, "Bill," who had contacted him about the Neoprene had offered it to him at 28 cents a pound, and was "on his neck" to get it off his hands. Stiller said he didn't know what to do with it. The appellant said that he would go down and see Stiller. About 5:30 that evening the appellant went to Custom Rubber. He told Stiller that he thought they ought to buy the Neoprene at the attractive price. Stiller said that they had no money to buy it with, and that they had a job coming up, but it might not break for a month or six months. He said that he didn't think it was feasible to invest any money in the Neoprene and put it aside, because it might age on them and give them trouble later on.

The appellant then said that he would tell Stiller the whole story on how he was going to buy the Neoprene at 28 cents a pound. He said a man delivered some rubber to him at California Rubber Products, and asked the appellant if he could use some Neoprene at an attractive price; and that they had a large surplus at duPont which was not carried on inventory, and the only way it could be moved would be on a bona fide purchase order from some company. Stiller said that they didn't have any credit established

with duPont, so their purchases would have to be C.O.D. The appellant said that he could supply the purchase order number from California Rubber Products and would pay the man 28 cents a pound cash, and that California would never be billed. Stiller said that they still could not buy it because they had no means of paying cash for it. The appellant asked him why he didn't call Mr. Snow at Fullerton, as there was a possibility that they could sell it to him for 38 cents a pound C.O.D., pay for the Neoprene immediately, and each have a nickel a pound profit. Stiller telephoned to Mr. Snow at Fullerton and told him that he had 3,000 pounds of GNA on hand, referring to the 3,000 pounds of Neoprene which the appellant had told him about, although he did not have it at that time. He told Mr. Snow that he had a big job coming up but didn't know how soon it would break, and that he didn't want to keep it on hand too long. He asked Mr. Snow if he would be interested in buying it at 41 cents. Mr. Snow said that he had just bought some, but that if Stiller had it at the end of the week he might be interested. He suggested that Stiller give him a call at the end of the week.

Stiller telephoned to Mr. Snow at the end of the week and told him that he still had the Neoprene. Mr. Snow said that he could use it and would make arrangements to pick it up on Monday. Stiller told him to make it Tuesday at noon, and to send a check. Stiller then called the appellant and told him that Mr. Snow had said that he would send a truck on Tuesday to pick up the Neoprene, and that he should arrange to have the Neoprene delivered to Custom Rubber Products on Monday. The appellant said that he would. Monday morning the appellant telephoned to Stiller and said that California's truck was all loaded up, and asked Stiller to have Albus rent a truck and go to duPont to pick up the Neoprene on a California purchase order. The appellant gave Stiller a purchase order number over the telephone. Stiller spoke to Albus and relayed the conversation he had had with the appellant, gave him the purchase order number over the telephone, and told him to pick up the Neoprene on the California Rubber Products purchase order. Later that day Stiller saw Albus and the latter gave him two copies of a bill of lading and a check for $1,230 from Fullerton Manufacturing Company. Stiller went to the bank and cashed it. He then telephoned to the appellant and told him that the Neoprene was picked up, the check was delivered

and cashed, and that he had his $840 to pay for the Neoprene along with his share of the profits, which all totalled $1,030. The appellant said that he was going to meet Stiller at Custom after working hours so that he would have the money to pay for the Neoprene the next day. That evening Stiller gave to the appellant $1,030, which was $840 to pay for the 3,000 pounds of Neoprene at 28 cents a pound, and the balance of $190 as his share of the profits. Stiller kept for himself $190 profit plus $10 for the truck expense.

A month or five weeks later Stiller heard again from the appellant about Neoprene, and there was a second transaction carried out substantially as the first one had been; Stiller got a sum of money from the resale of the Neoprene to Fullerton and split it up, giving $1,030 to the appellant. The same thing was done on a third, fourth and fifth occasion.

As to the sixth transaction, defendant Stiller testified that in late July he had made arrangements with Mr. Shawger, President and General Manager of California Rubber Products, for the witness to come to the latter's plant to "mix" some stock. Accompanied by Albus, the witness arrived about 6:30 p. m. and appellant opened the door. The latter pointed to some Neoprene near the rear door and stated that it belonged to Custom Rubber. After the witness and Albus finished mixing the rubber, they loaded it on the truck, and then they loaded about three-quarters of the Neoprene on the truck; the next day appellant brought the balance of the Neoprene to Montebello; it was then sold to Fullerton, and the witness got a check from Fullerton, cashed it and gave appellant $840 for the Neoprene and $190 as his share of the profit.

On the seventh occasion, according to the testimony of defendant Stiller, appellant told him during the latter part of July, 1955 that, "this fellow Bill had another 3,000 pounds of Neoprene," and the witness told appellant that maybe they could buy that load for Custom as they had some job pending, but he did not contact Fullerton on this load. He testified further that the first knowledge that he had that California Rubber was being charged for this Neoprene was during the interrogation at the district attorney's office; he believed appellant—that a bill would not be received by California Rubber; he understood appellant was going to pay for it; he relied completely upon appellant. The witness further testified that he honestly believed when he gave appellant the $840 on each of the six transactions when

the GNA was sold to Fullerton that he was paying for the purchase of the GNA Neoprene.

We shall first give consideration to appellant's contention that Deputy District Attorney Ritzi was guilty of prejudicial misconduct while testifying as a witness for the People. In this regard it appears that Mr. Ritzi was first assigned to try the case against appellant and was prepared so to do on the morning the case was called for trial. That he and Mr. Carr, the deputy district attorney who actually tried the case, had examined the same and "had many discussions on this case." However, Mr. Ritzi did not actually participate in the trial, but during the progress thereof was called by Mr. Carr as a witness in behalf of the People and testified concerning an offer made by appellant to plead guilty. On cross-examination Deputy District Attorney Ritzi was asked by appellant's counsel about the former's conversation with appellant, and in that connection was interrogated as follows:

"Q. (By Mr. Gershenson, appellant's counsel): In other words, that morning (the date of the conversation) you had determined, without hearing any evidence, that Mr. Arends (appellant) was guilty beyond a reasonable doubt? A. Counsel, I had read the file, and I concluded in my own mind that it was a proper case, certainly to take to trial. A preliminary hearing had already been had in this matter, and the evidence was heard in the Municipal Court, and the defendant was there held to answer; and it was brought up to the master calendar and it was examined by another deputy district attorney, and then it was examined both by Mr. Carr and myself, and we had many discussions on this case.

"MR. GERSHENSON: Move the answer be stricken, your Honor, as not responsive.

"THE COURT: Motion is denied.

"Q. BY MR. GERSHENSON: Did you, without any evidence, hearing any witnesses, determine in your mind that Mr. Arends was guilty beyond a reasonable doubt?

"THE WITNESS: Counsel, I have never taken a trial—a case to trial, in which I had not in my own mind concluded that the defendant should be tried. We have an obligation.

. . . . . . . . . . . . .

"Q. BY MR. GERSHENSON: Now, at the time that you talked with Mr. Arends, you knew he had no counsel, didn't you? A. Yes; I did.

"Q. And you were not aware at that time but what Mr. Arends might be able to come up with a good and substantial defense; is that correct? A. Well, I don't understand your question.

"(The reporter read the question.)

"MR CARR: I am going to—go ahead and answer it.

"THE WITNESS: From my examination of the file, from my talks with Mr. Arends, and from my talks with the investigators, *it was my considered opinion that the defendant was guilty.*

"Q. BY MR. GERSHENSON: It was your considered opinion?

"THE WITNESS: *Certainly.*" (Emphasis added.)

Following further testimony on cross-examination concerning the events of the morning when the appellant offered to plead guilty, Mr. Ritzi testified on redirect examination that the only reason he refused to permit the appellant to plead guilty was that he did not have a lawyer; also, concerning his experience and functions in the district attorney's office; and that he had been in court the day the appellant offered to plead guilty prepared to try the case for the People. Then the following question and answer were asked and given:

"Q. (By Deputy District Attorney Carr): Is there any rule in the office that compels you to try a case if there is a reasonable doubt in your mind as to the guilt of the defendant?

"A. Absolutely not. Very much to the contrary. In our office—and I think the folks should understand and know— we are interested as much in protecting the rights of the defendant as we are in protecting the rights of the public *And unless we are convinced in our own mind that an individual is guilty of the offense, we dismiss it.* There is absolutely no obligation to try the case. Very much to the contrary, we are not supposed to try it." (Emphasis added.)

No objection was made to the foregoing question, no motion was made to strike the answer, and no request was made that the jury be instructed to disregard the answer.

With commendable fairness, the attorney general does not contend that the answer was not prejudicial, but insists that because appellant failed to move to strike any of the foregoing answers given on cross-examination, or the one now complained of on redirect examination, appellant waived any right he might have had to complain of them on appeal.

We are not unmindful of the general rule in this state that an assignment of misconduct and a request that the

court admonish the jury to disregard the objectionable argument or conduct of the prosecuting officer is a necessary prerequisite for complaint in an appellate tribunal. As stated in *People* v. *Simon*, 80 Cal.App. 675, 679 [252 P. 758], "... The reason for this rule being, as stated in a number of these cases, that the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ██ But, as stated in the case just cited, "There is, however, a well-recognized exception to this general rule, and the exception is simply this: Where an examination of the entire record fairly shows that the acts complained of are of such a character as to have produced an effect which, as a reasonable probability, could not have been obviated by any instructions to the jury, then the absence of such assignment and request will not preclude the defendant from raising the point in this court."

██ We are satisfied that the present case comes within the foregoing exception to the rule. We do not feel that any admonition the court could have given to the jury could have effectively removed the prejudice engendered by the testimony of the deputy district attorney that he had "studied" the case, "was prepared to try it," and was "convinced" that appellant was guilty. We are here again confronted with a situation wherein the prosecution attempted to do by indirection what it could not have done directly.

Respondent contends that the answer of Deputy District Attorney Ritzi that appellant was guilty was elicited by questions asked of him on cross-examination by appellant's counsel. This argument lacks substance here. We think the trial judge should have stopped the discourse of Deputy District Attorney Ritzi when he was under cross-examination without waiting for an objection or motion to strike. That such testimony was immaterial and highly prejudicial is manifest. Therefore, the argument that appellant's counsel "opened the gates" is unavailing. ██ As was said by this court in *People* v. *McDaniel*, 59 Cal.App.2d 672, 677 [140 P.2d 88], "An error that is prejudicial is no less so because it results from a lack of knowledge on the part of either counsel or both. ██ Legitimate cross-examination does not extend to matters improperly admitted on direct examination. ██ Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony. The so-called 'open

the gates' argument is a popular fallacy. 'Questions designed to elicit testimony which is irrelevant to any issue in the case on trial should be excluded by the judge, even though opposing counsel has been allowed, without objection, to introduce evidence upon the subject.' (27 Cal.Jur. p. 74.) ██ 'It is a settled rule that cross-examination as to matters irrelevant to the issue may and should be excluded—even though, in some cases, testimony relative thereto was elicited upon direct examination—and that a party may not, under the guise of cross-examination, introduce evidence that is not competent within the meaning of the established rules.' (27 Cal.Jur. p. 106.)'' The same rule applies to incompetent evidence elicited ''under the guise'' of redirect examination. [11] While a prosecuting officer may use every legitimate means to bring about a just conviction, it is just as much his duty to refrain from improper methods calculated to produce a wrongful conviction (*Viereck* v. *United States*, 318 U.S. 236, 247-248 [63 S.Ct. 561, 87 L.Ed. 734, 741]).

 True, we are not here concerned with statements by the deputy district attorney who actually tried the case, but in our opinion the foregoing conduct of the trial deputy district attorney who had prepared, and was to try the case and withdrew therefrom on the morning of the trial, and appeared as a witness, aggravated the prejudice already created by the witness when on cross-examination he stated, ''. . . it was my considered opinion that the defendant was guilty.'' This we say because the deputy who appeared as a witness was under oath, and when the trial deputy asked him, as above set forth, concerning the existence of any rule in the office of the district attorney, ''that compels you to try a case if there is a reasonable doubt in your mind as to the guilt of the defendant,'' and which permitted the witness to testify under oath as heretofore narrated in detail, that ''. . . unless we are convinced in our own mind that an individual is guilty of the offense, we dismiss. There is absolutely no obligation to try the case. Very much to the contrary, we are not supposed to try it.'' When we view the situation here confronting us with the views expressed by our Supreme Court in *People* v. *Kirkes*, 39 Cal.2d 719, 721-727 [249 P.2d 1], we are persuaded that the conduct here complained of militated against appellant having that fair and impartial trial which the law requires for every person charged with a crime. As was said in the case just cited, at pages 723-724, '' 'When the

district attorney declared that he would not prosecute any man he did not believe to be guilty he thereby wrongfully placed his personal opinion of the guilt of the defendant in evidence in the case. He was privileged to argue to the jury that it was his opinion formed from deductions made from the evidence adduced at the trial that the defendant was guilty of the crime charged (*People* v. *Rogers,* 163 Cal. 476 [126 P. 143] ; but his declaration to the jury that he would not prosecute any man whom he did not believe to be guilty was tantamount to an assertion that he believed in the guilt of the defendant at the very inception of the prosecution; and necessarily such belief must have been founded upon the result of the district attorney's original and independent investigation of the charge, and therefore in all likelihood was based, in part at least, upon facts which did not appear and which perhaps could not have been shown in evidence.' '' This is exactly what occurred in the case now engaging our attention, wherein Deputy District Attorney Ritzi, as a witness, testified that, ''From my examination of the file . . . and from my talks with the investigators, it was my considered opinion that the defendant was guilty.''

It would be an impeachment of the legal learning of both deputies district attorney to intimate that they did not know that the aforesaid questions asked by the trial deputy, and the answers given on both cross-examination and redirect examination by the deputy who prepared the case for trial, were highly improper and peculiarly calculated to prejudice the substantial rights of the appellant. To entertain a contrary view is to ignore human experience and the dictates of common sense. We are also persuaded that the saving grace of section 4½ of article VI of our state Constitution should not come to the rescue of this conviction. ▮▮▮ As was stated by this court in *People* v. *Duvernay,* 43 Cal.App.2d 823, 829 [111 P.2d 659], '' 'We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 P. 32].)' ▮▮▮ There is creditable authority for the statement that the phrase 'miscarriage of justice,' as used in the constitutional provision, 'does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form

of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. "It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected." ' (*People* v. *Wilson,* 23 Cal.App. 513 [138 P. 971].) In the instant case we do not regard the evidence as sufficient to put into operation the provisions of section 4½ of article VI of the Constitution, because even convincing proof of a defendant's guilt does not necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney,* 201 Cal. 618 [258 P. 607] ; *People* v. *Patubo,* 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303].) When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law. (*Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)'' (See also *People* v. *Gilliland,* 39 Cal.App.2d 250, 265 [103 P.2d 179].)

Appellant also contends that the trial deputy district attorney was guilty of prejudicial misconduct in arguing to the jury the fact that the former did not testify in his own behalf, and in implying that he was guilty of other offenses, including evasion of income taxes, and prior acts of grand theft. Since we have determined that the convictions must be reversed for the reasons above stated, it would serve no useful purpose, and unduly extend this already lengthy opinion, to consider in detail the contentions of appellant in this regard. The pertinent rule is contained in article I, section 13 of the California Constitution and in Penal Code, section 1323. In *People* v. *Adamson,* 27 Cal.2d 478, 488, 489 [165 P.2d 3], our Supreme Court stated: "It is clear from the terms of the constitutional provision that the consideration and comment authorized relates, not to the defendant's failure to take the stand, but to 'his failure to explain or deny by his testimony any evidence or facts in the case against him' whether he testifies or not. The constitutional provision thus makes applicable to criminal cases in which the defendant does not testify, the established rule that the failure to produce evidence that is within the power of a party to produce does

not affect in some indefinite manner the ultimate issues raised by the pleadings, but relates specifically to the unproduced evidence in question by indicating that this evidence would be adverse. . . . Therefore the failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable. . . .''

In the instant case, without detailing the assailed language, it will suffice to say that the remarks were in the main statements of the evidence or reasonable inferences drawn therefrom and they did not transcend the bounds of permissible argument. The border line of permissible argument however, was approached by the prosecutor when, in the course of his argument, he said:

''Now, we come to another matter which I touched upon lightly yesterday and which is worthy of your consideration, and that is the refusal of the defendant Charles Arends to take the witness stand here and tell you what he knows about it. He wants you, ladies and gentlemen, to tell him that he participated honestly in this transaction—in these transactions, but he won't tell you that. He won't tell you that. He wants to tell you that he honestly came by these purchase orders, but he won't tell you that. He won't tell you why he conceived in his mind the plan to use the purchase orders of California Rubber Products——.'' An objection to this line of argument was interposed and overruled.

While it is true that this statement might be construed as a declaration that the jury should infer guilt solely from appellant's silence, however, when construed in the light of the prosecutor's argument in its entirety, it appears improbable that the jury was misled. When taken in connection with the prosecutor's review of the evidence, the challenged statement might well be regarded in connection therewith, as a conclusion that although the evidence established guilt, the accused failed to explain or deny it.

Appellant also contends that the refusal to grant a severance of the trial of appellant and his codefendant constituted an abuse of discretion. Since the codefendant was acquitted this issue will not arise on a retrial.

 We are persuaded that the court did not err in refusing to instruct the jury regarding the testimony of an

accomplice because appellant and his codefendant were both charged with the same offenses. Neither was called as a witness for or against the other and the codefendant Stiller testified solely on his own behalf. In this situation it would have been highly improper and prejudicial to him had the court in any way indicated he was an accomplice and that his testimony should be viewed with caution. (*People* v. *Burnette*, 39 Cal.App.2d 215, 231 [102 P.2d 799]; *People* v. *O'Brien*, 96 Cal. 171, 180-181 [31 P. 45].) Such a situation will not be again presented.

The attempted appeal from the "imposition of sentence" is dismissed. For the foregoing reasons the judgment and the order denying defendant's motion for a new trial are, and each is reversed, and the cause remanded for a new trial.

Fourt, J., and Drapeau, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 23, 1958. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.