[Crim. No. 9946.    Second Dist., Div. Four.    Aug. 26, 1965.]

THE PEOPLE, Plaintiff and Respondent v. TOMMY GURULE et al., Defendants and Appellants.

David A. Binder, under appointment by the District Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—By information, defendants Gurule, Gonzales and Sandoval (not appealing), were charged with burglary (Pen. Code, § 459). In addition, four prior felony convictions were alleged as to Gonzales, and two as to Gurule. On the issue of the truth of the alleged prior convictions a jury trial was waived and the court found each prior conviction to be true. Thereafter, a jury convicted each defendant of the burglary charge. Gurule and Gonzales appeal from the judgments rendered.

Daryl Mulligan, a manager at the Buy-Fair Market in the City of Industry, closed the market and set the burglar alarm at 12 midnight on November 21, 1963. Before leaving he had particularly observed that a floor display of cigarettes was in order. He did not give defendants permission to enter the store after he locked up.

At 3:55 a.m. Officers Anderson and Baker, deputy sheriffs assigned to duty in the City of Industry, received a call to go to the Buy-Fair Market. The officers in uniform proceeded to the vicinity of the market and alighted from their vehicle. Anderson went to the front of the building and Baker to the rear. Anderson heard a banging noise coming from the direction of the market and saw a man run out of the east door of the market about 75 feet away from where he was standing.

When his shouted commands "Police—stop or I'll shoot" went unheeded, he fired at the man. The man ran around the southeast corner of the building. When Officer Anderson reached the spot where the man had disappeared he saw Officer Baker standing near a fence at the rear of the building shouting at the suspect who was then running across a field.

When Baker had first arrived at the market he heard a banging noise at the center door in the rear of the building. The noise then stopped and he heard a banging noise on the receiving door of the meat section. He concluded that someone was attempting to break open the door. He then heard what sounded like two shots from the west side of the store. As he ran in that direction he heard someone moaning and saw a person run around a corner. He ran behind the market and heard moans coming from the other side of a fence. There appeared to be blood on the fence. The officer then observed a man in a field behind the fence getting up from a prone position. He shouted to the man to stop. The man staggered to his feet and ran across the field.

Both Baker and Anderson pursued the man—Baker firing five shots—but the man pulled himself over a second wall and disappeared. The officers then returned to the market and entered the east door which was sprung open. Anderson found defendant Sandoval crouched down behind some boxes in the liquor department. After taking him outside the officer asked him how many others were involved, and he replied that there were two others. He gave the names of these persons, stating that the three of them came to the store in his car, which was parked on a side street, with the intention of stealing cigarettes.

Anderson then reentered the market and, in the produce section, found Gonzales crouched behind some boxes. The latter gave his name and address but refused to say any more. After he was taken from the store the officers looked through the store again. They observed five large cardboard cartons on the floor in front of the cigarette display. The cartons were filled with various brands of cigarettes. Anderson later found, parked near the market, a 1957 Dodge which was registered to Sandoval.

At 8:15 a.m. on November 22, 1963, Officer Stanfield talked with Sandoval in the sheriff's station interrogation room. The officer stated that he knew that he, Gurule and Gonzales were involved in the burglary; that they believed Gurule had

been shot; and that the police wanted to find him. Sandoval stated he was willing to help but was unable to show the officers where Gurule was living; that if they asked Gonzales, he would tell them.

Stanfield then interrogated Gonzales. The officer testified that he first informed defendant, "that he knew that he, Sandoval and Gurule had committed a burglary." He further stated that Gurule had been shot and that they were looking for him. Gonzales then stated that they had committed the burglary; that he had gone up to the door of the market; used a crowbar to pry open the door; he and defendant Gurule then entered the building; Sandoval remained outside as a lookout. In addition, Gonzales told the officers where they could find Gurule.

At approximately 11 a.m., the same morning, Officer Stanfield arrested Gurule at a residence in the City of South Gate. At the time of the arrest the officer observed a blood spot on Gurule's trousers and asked him how many times he had been shot. Gurule replied that he "didn't know, once or twice." At the officer's command, Gurule then removed his trousers and the officer observed small bandages on his left hip and left inner leg. Officer Stanfield asked Gurule where the clothes were that he had worn at the time he was shot, and defendant, after at first stating he would not tell him, showed the officer a small box which contained a set of man's clothing. Gurule was then taken to the hospital for treatment.

Stanfield had a conversation with him at the hospital while he was being treated. Gurule stated that, on the night before, he was at his wife's home in the company of Gonzales and Sandoval. They decided to go out for something to eat. He heard Gonzales and Sandoval discuss committing a burglary. He asked them "What are *you* going to hit?" [Italics added.] They replied, "The Buy-Fair." Sandoval then drove the three of them to the vicinity of the market and parked. They walked through a field to the market; either Gonzales or Sandoval "popped the door" with a crowbar; and the latter entered the market. He remained outside. A few minutes later he saw a police car and started to run. When asked why he ran, he said, "Well, I knew they wouldn't believe me anyway." Acknowledging that he heard the officers say "Stop or I'll shoot", Gurule stated "Yes, I did, but I didn't care whether I died or not."

Shortly after 3 p.m. on November 22, Gonzales again made

a statement regarding the joint plan and execution of the burglary by himself and defendants Gurule and Sandoval. He had met Sandoval in a bar in Los Angeles. They went to Gonzales' residence where they obtained a crowbar from the garage. They then drove to Gurule's residence, picked him up and drove to the market. Using the crowbar he pried open a door. He and Gurule went in. He was looking for money. The police then arrived and he was arrested while still inside the market.

At 5:30 p.m. Gonzales was brought to the Buy-Fair Market where he showed the officers how he used the crowbar to gain entry.

On November 23, 1963, Officer Stanfield interrogated both Sandoval and Gonzales at the same time. Each admitted complicity in the burglary. Gonzales again acknowledged being the one who opened the door, and Sandoval stated that he acted as lookout.

Prior to the introduction in evidence of each of the statements made by defendants the court instructed the jury that each statement was to be considered only as against the defendant who made it, that it could not be considered as against his codefendants.

Lorraine Sarmiento testified, that on the evening of November 21, 1963, the defendants were at her home. She heard the three of them discuss committing a burglary at the Buy-Fair Market. She told Gurule not to go, but he said he was going to go anyway, "for kicks."

Gurule testified in his defense that he was at his wife's house with Sandoval and Gonzales during the early morning hours of November 22. They all were drinking and talking about "old times." When Gonzales and Sandoval decided to go back to Los Angeles, he asked if they would take him to a friend's house. This was about 3 a.m. He wanted to see the friend about a job. They drove him to this location. After he had knocked on the door and received no response he walked back to the car and found Sandoval and Gonzales were not in it. He thought they might have gone looking for some place still open in order to buy cigarettes. He went looking for them, and, when he reached the parking lot of the market, he saw the officers. He became frightened and ran when they began shooting at him. He did not realize he had been shot until he arrived at his brother's house in South Gate. He did not call a doctor "because I was too tired and I was just laying around trying to get some rest. . . ."

Gonzales testified that on November 21 he spent the day drinking beer and whisky with Sandoval and Gurule; he was intoxicated and did not remember what happened after he left Gurule's house.

As above indicated appellants made a number of statements to the police after their arrests. Evidence of these statements was introduced at the trial. Since this case was tried prior to *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], the record quite understandably fails to disclose that, prior to the questioning by the police which elicited the statements, either appellant was informed of his right to counsel or to remain silent, or that these rights were waived by appellants. Consequently, we must determine whether *People* v. *Dorado, supra,* requires the reversals of the judgments.

█ With respect to the evidence of the statements made by Gonzales, at least three of the statements constituted full confessions of guilt—made at a time when he was in custody, with suspicion clearly focused on him. That the confessions were elicited through a process of interrogation tending to elicit such statements, cannot be doubted. The first of his confessions was made a number of hours after his arrest, in an interrogation room of the sheriff's department, and after he was first told by an interrogating officer that the officer "knew that he, Sandoval and Gurule had committed a burglary." Under such circumstances, the *Dorado* rule is clearly applicable. (See *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal. Rptr. 201, 400 P.2d 97].) In so ruling we need not discuss a further contention urged by Gonzales.

Gurule also made a number of incriminating statements to the police after his arrest. █ The questions asked by the officers which elicited the statements as to the number of times he had been shot and the location of the clothing he was wearing at the time, clearly were part of the preliminary and investigatory procedure, designed to verify or to remove the finger of suspicion cast on Gurule by the previous statements of Sandoval and Gonzales. These statements were therefore not within *Dorado.* █ However, we believe that the evidence of the statements made during the officer's "conversation" with Gurule at the hospital was inadmissible under the *Dorado* rule. Gurule was then under arrest and suspicion not only had focused on him but the discovery of the bloody clothes and his statements about them had mark-

edly sharpened that focus. The officer testified that he and his partner remained with Gurule ''the whole time'' he was in surgery; that the conversation with Gurule took place ''at the same time Gurule was being treated''; and that the subject of the ''conversation'' was ''his part in the burglary.'' We think it clear that the officer, while he was acting with commendable zeal under the then existing law in attempting to secure a statement which would insure a conviction, was engaged in the accusatory process which *Dorado* now holds improper in the absence of the required warning.

However, the *Dorado* violation is not a ground for reversal. The statement did not amount to a confession and thus the automatic reversal rule of *Dorado* does not apply. While Gurule admitted that he was present when his codefendants had discussed committing the burglary and that he went with them to the scene of the crime, he never admitted taking any active part in its commission. The total evidence against Gurule, without considering any of the statements to the police, is overwhelming. Shortly after the burglary he was found at home with fresh untreated gunshot wounds for which there was no innocent explanation. The officers had wounded the suspect who had escaped from the scene of the crime. Miss Sarmiento testified that she overheard Gurule plan the burglary with his two codefendants just prior to the time it occurred. We regard Gurule's testimony at the trial—which placed him at the scene as a spectator—as being compelled not so much by what he had said to the officers, but by the necessity of explaining the bullet wounds which very convincingly identified him as the man who had fled from the market. A retrial could not be expected to bring a more favorable result to this defendant if all statements to the police were excluded. (See *People v. Hillery*, 62 Cal.2d 692, 713 [44 Cal.Rptr. 30, 401 P.2d 382].)

Gurule in addition contends that the trial court erred in failing on its own motion to give accomplice instructions with respect to the testimony of codefendant Sandoval. It is argued that the jury should have been instructed that if it found Sandoval to be an accomplice, his testimony should be viewed with distrust (Code Civ. Proc., § 2061, subd. 4) and would require corroboration to support a conviction. (Pen. Code, § 1111.)

Sandoval testified in his own defense, denying any involvement in the crime. He stated that, when he heard Gonzales and Gurule talking about committing the burglary, he

thought the whole thing was a "joke"; he told them he wanted no part in it; he drove them to the place where the car was found; they said they were going to buy some cigarettes; when they failed to return, he walked over to the market; saw the police; and, when someone shouted "halt" and he heard gunfire, he panicked and ran and hid in the store where the officers found him. Sandoval further testified, in response to questioning by his defense counsel, that at the time he ran and hid in the market he had seen Gurule run out of the market. Gurule points to the latter testimony and argues that, since he was directly implicated in the commission of the crime by this testimony, the cautionary instructions should have been given.

The corroboration instruction as prescribed in Penal Code section 1111 was clearly not applicable in this case. As stated in *People* v. *Melone,* 71 Cal.App.2d 291, 297 [162 P.2d 505], ". . . an instruction by the court on its own motion covering section 1111 is necessary *only when the accomplice witness is called by the People.*" [Italics added.] (See also *People* v. *McEvers,* 53 Cal.App.2d 448, 453 [128 P.2d 93].)

As regards the applicability of the instruction that if the jury found that the codefendant was an accomplice it must view his testimony with "distrust", *People* v. *Arends,* 155 Cal.App.2d 496 [318 P.2d 532], and *People* v. *Green,* 181 Cal.App.2d 747 [5 Cal.Rptr. 525] are controlling here.

In *People* v. *Arends, supra,* 155 Cal.App.2d 496, in exculpating himself the codefendant implicated the defendant. The court held (at p. 513), that it was not error for the trial court to refuse to give instructions concerning accomplices since "Neither was called as a witness for or against the other and the codefendant . . . testified solely on his own behalf." In so concluding the court reasoned (at p. 513), ". . . it would have been highly improper and prejudicial to [the codefendant] . . . had the court in any way indicated he was an accomplice and that his testimony should be viewed with caution. [Citations.]"

In *People* v. *Green, supra,* 181 Cal.App.2d 747, the appellant and a codefendant were both charged with and convicted of grand theft and forgery. The offenses arose out of a transaction involving the pretended purchase of a ring from a third person and the issuance of a "bad" check in payment by appellant. The codefendant delivered the check and was given possession of the ring. He was thereafter apprehended

and the ring was recovered. The codefendant, testifying in his own behalf, stated that appellant was the one who purchased the ring and that he had merely assisted appellant in carrying out the transaction. Appellant testified, denying any involvement in a plan to get the ring, and further denied that he had instructed his codefendant to carry out the transaction. In relying on *People* v. *Arends, supra,* the court held that the trial court did not err in refusing to give accomplice instructions requested by appellant, since both defendants were charged with the same offense, each testified in his own behalf, and neither was called as a witness for or against the other.

In the instant case neither Sandoval nor Gurule testified as an accomplice. Each testified in his own defense and defended himself by accusing the other. These circumstances preclude the giving of any instructions on accomplices.

The judgment of conviction of Gonzales is reversed. The judgment of conviction of Gurule is affirmed.

Files, P. J, and Kingsley, J., concurred.