[No. C001350. Third Dist. Nov. 10, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY MARTIN FOWLER et al., Defendants and Appellants.

COUNSEL

Robert N. Black, under appointment by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, W. Scott Thorpe and David de Alba, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HARVEY, J.*—The defendants were convicted after a jury trial of voluntary manslaughter (Pen. Code, § 192, subd. (a)). The jury found that the defendant Fowler personally used a deadly weapon in the commision of the offense (Pen. Code, § 12022, subd. (b)). The trial court sentenced each defendant to a term of six years and ordered that Fowler's one-year term for use of the deadly weapon be stayed pending completion of the term for the substantive offense. Defendants appeal, claiming errors in instructions and insufficiency of the evidence to show an intent to kill.

On October 22, 1985, the victim, Jack Lawson, together with his fiancee, Beverly G., were living at the home of defendant Fowler in Dunsmuir, California. Defendant Barley lived close by and was a close friend of defendant Fowler. Defendants had been acquainted with the victim for three or four months. The victim and his fiancee had lived in a car in Barley's driveway for a short time, and then moved into the living room of Fowler's house.

On October 22, 1985, the victim, defendant Fowler and his wife, defendant Barley, and Beverly were drinking at Fowler's house. An argument broke out; the victim then left after slapping Beverly and ordering her to leave. Later that afternoon, the victim went to the house of Louie Webster. The defendants drove up about 15 or 20 minutes later and remained sitting in their truck. They had a shotgun with them. The victim went to the truck and talked with the defendants for a few minutes, and then went back to Webster's house. About 45 minutes or so later, the victim left again saying that he was going to get that shotgun.

Between 10:30 and 11 p.m. that night, Beverly returned to the Fowler residence, and she saw the victim's car there. She heard loud voices inside,

---

*Assigned by the Chairperson of the Judicial Council.

so she did not go in and instead went to a neighbor's house. After about 15 or 20 minutes, she saw the victim's car leave, so she went to the Fowlers' house and found that it was messed up and had blood in it.

About 11 p.m., the defendants arrived at Webster's residence in the victim's car. Barley had blood all over him. Fowler did, too, but it was not so apparent because of his dark clothes. Fowler asked Webster, "Hey, man, do you know where to dump a body at?" After some brief conversation, defendants took Webster to the victim's car, and opened the trunk to reveal the victim lying inside. The victim was still alive at the time, but he was in bad condition, unable to talk, barely mumbling, barely breathing. Fowler said to Webster, "Go ahead, man, throw a blow on him. Ain't nothing he can do about it now." Webster declined, whereupon Fowler struck the victim with several solid punches.

At some time during the conversation at the Webster house, Barley said that the victim had told Barley that he was going to take Barley's "old lady" to bed and Barley started fighting. Fowler said that while Barley and the victim were fighting, Fowler got a gun to shoot the victim, he shot it and nothing came out, so Fowler beat the victim with it.

During the conversation at the Webster residence, defendants were described as being in good spirits, like they were happy about something, babbling, laughing, keyed up, "like 'Wow! We did it!' like they had all kinds of adrenalin going inside of them."

After 15 minutes or so, defendants left Webster's house, but they could not get the victim's car to start. Hence, they left without the victim's car, leaving the victim in the trunk. The defendants returned to the Barley house, and were still excited. They were laughing, talking loudly, and joking. They said the victim was at the lake fishing.

As soon as the defendants left the Webster residence Webster attempted to obtain help for the victim. However, the victim died at around 1:30 a.m. on October 23, 1985, as the result of the beating he had sustained.

The next morning, the defendants, Fowler's wife, and Beverly attempted to clean up the Fowler house. While there, Barley joked about the lewd way the victim asked for mercy.

When the state criminalist arrived later that day, he found areas on the floor of Fowler's house very wet with water containing blood, he found a window curtain in the kitchen sink as if it were being washed, the curtain having blood spots on it. He found blood splatters on a wall, blood on the

side, front, and top of the television, blood on the carpet, and blood on the cushion and arm of a chair; he also found blood on a radio, a coffee table, and the threshold of a door. Pieces of a broken gun stock also had blood on them. The metal parts of the shotgun were found at a different location in the house, and they, too, had blood on them. All of the blood was type O, which was the victim's blood type. Both defendants had type A blood. Outside the house, a pair of parallel drag marks, 12 inches apart, went from the residence to the street.

When Fowler was arrested on October 23, 1985, he had the victim's blood on his cap and boots.

Both defendants testified. They testified that the victim was a violent man who bragged that he had killed a previous wife and had stabbed a fellow inmate when the victim was in prison, and who frequently picked fights. They testified that the victim started the fight on October 22 by striking Barley, the victim threatened to rape and stab their wives, the victim pulled a knife during the fight, and the fight between themselves and the victim simply continued until the victim finally acknowledged that he had enough. When the fight stopped, the victim was still conscious and talking intelligently. They testified that the victim was struck only with fists and feet during the course of the fight.

The defendant Fowler testified that the fight originally broke out between the victim and Barley while they were outside of Fowler's house. When Fowler came upon the fight, the victim advanced on Fowler, whereupon Fowler grabbed the shotgun and pointed it at the victim in order to compel him to back down. However, the victim grabbed the shotgun out of Fowler's hands and smashed it on the concrete. Fowler testified that, eventually, the victim was thrown to the ground, and "Carl [Barley] was mad and was banging his head on the concrete." Fowler described how Barley grabbed the victim, they both fell, Barley got the victim by the hair and just kept banging his head on the concrete steps. Fowler later testified on cross-examination that, when Barley had the victim on the ground and was punching him, it was "excessive." Fowler admitted telling Detective Sommers that there was an excessive beating given to the victim by Barley. He admitted telling Detective Sommers that Barley was really mad, the victim was on the ground, and that Barley was picking him up by the shirt and punching him in the face repeatedly for a period of three or four minutes. Fowler admitted telling Detective Sommers that, while this beating was going on, Barley was screaming, "Call me a baby-raper, will you?" And, in testimony, Fowler admitted that many of these things occurred.

A statement that Fowler made to Detective Sommers on October 23, 1985, was read into evidence, and in that statement Fowler stated that

Barley was on top of the victim, pulling his head up by the hair, striking him again and again in the face. Fowler stated that Barley kicked the victim while he was lying on the ground several times in the head area and in other portions of the body.

Defendant Barley testified that the fight originally started when the victim struck Barley. After a general melee, Barley knocked the victim down and then, "I kind of went blank." Barley testified, "Next thing I remember was standing over him with his head of hair in my hand, my fist cocked back." The victim then said, "No, I've had enough; leave me alone."

■ The defendants contend that the trial court erred in giving an instruction on accomplice testimony. The court instructed the jury, "The testimony of an accomplice which tends to incriminate the other in the offense for which they are on trial should be viewed with distrust."

■ Usually, when an accomplice (not a defendant) is called as a witness by the People, the court is required to give a cautionary instruction concerning the accomplice's testimony even though no request is made. (*People v. Miller* (1960) 185 Cal.App.2d 59, 82 [8 Cal.Rptr. 91].) In *People v. Graham* (1978) 83 Cal.App.3d 736 [149 Cal.Rptr. 6], however, the court held that it was error to give the cautionary instruction when the accomplice was called to testify by the People because the accomplice in fact gave testimony helpful to the defendant. It is error to give the cautionary instruction when an accomplice is called as a witness by the defense. (*People v. Hartung* (1950) 101 Cal.App.2d 292, 295 [225 P.2d 614].)

In *People v. Arends* (1957) 155 Cal.App.2d 496 [318 P.2d 532], a trial involving a codefendant who testified, the court held that it was proper to refuse to give the cautionary instruction concerning accomplice testimony. The court said, "Neither [defendant] was called as a witness for or against the other and the codefendant Stiller testified solely on his own behalf. In this situation it would have been highly improper and prejudicial to him had the court in any way indicated he was an accomplice and that his testimony should be viewed with caution." (*Id.,* at p. 513.) *Arends* is cited with approval in *People v. Gurule* (1965) 236 Cal.App.2d 847, 854 [46 Cal.Rptr. 459]. The court said there, "In the instant case neither Sandoval nor Gurule testified as an accomplice. Each testified in his own defense and defended himself by accusing the other. These circumstances preclude the giving of any instructions on accomplices." (*Id.,* at p. 855.)

In *People v. Catlin* (1959) 169 Cal.App.2d 247 [337 P.2d 113], a codefendant testified in his own behalf, but he confessed his guilt and incriminated the defendant Catlin. Catlin requested the cautionary instruction, and the

appellate court held that it was error to refuse the instruction. The court held that the cautionary instruction must be given under such circumstances, with or without a specific request for such an instruction. (*Id.,* at p. 254.) The court distinguished *Arends* on the ground that there the codefendent exonerated himself while incriminating the defendant while in *Catlin* the testifying codefendant admitted his guilt.

In *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 73 [63 Cal.Rptr. 749], the court summed up these cases as follows: "When one of several defendants takes the stand to confess his own guilt and incriminates his codefendants, the accomplice instruction should be given. [Citations.] If, however, each of several defendants testifies in his own defense and none is called as a witness for or against the others, the instructions are not appropriate. [Citation.] Even where one defendant denies participation and incriminates another, the instruction should not be given."

In *People* v. *Terry* (1970) 2 Cal.3d 362, 399 [85 Cal.Rptr. 409, 466 P.2d 961], the Supreme Court explained these rules as follows: "Ordinarily, the instructions on accomplice testimony need be given on the court's own motion only when the accomplice witness is called by the People [citations] or when a defendant in testifying implicates his codefendant while confessing his own guilt. [Citation.] In the latter instance, the confession on the stand, for all practical purposes, relieves the jury of the decision whether the declarant was an accomplice. When a defendant has confessed his guilt, there is little need to worry about prejudicing him by giving an accomplice testimony instruction for the protection of his codefendant. But here Juanelda [the accomplice codefendant] testified in her own behalf, not as a prosecution witness, and denied her guilt. Thus, it was not incumbent to give the accomplice testimony instructions." The Supreme Court also explained, "To instruct the jury about accomplices in respect to her testimony might have been prejudicial to her." (*Id.* at p. 398; citing *People* v. *Arends, supra,* 155 Cal.App.2d 496, with approval.)

The historical reason for the rule requiring a cautionary instruction when an accomplice testifies as a witness for the People is that the evidence is coming from a tainted source. The source is tainted both because of the accomplice's participation in the crime and because he is ". . . usually testifying in the hope of favor or the expectation of immunity . . . ." Hence, he is " . . . not entitled to the same consideration as the evidence of a clean man, free from infamy." (*People* v. *Dail* (1943) 22 Cal.2d 642, 654 [140 P.2d 828].) In *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 967 [127 Cal.Rptr. 135, 544 P.2d 1335], the Supreme Court said: "Accomplice testimony is suspect because, like hearsay, it too may be unreliable. '[E]xperience has shown that the evidence of an accomplice should be

viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity.' [Citations.] In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility."

Where a witness testifies *for* a defendant, the rationale underlying the cautionary instruction no longer applies, so it is usually held that the giving of the cautionary instruction is error. (See *People* v. *Graham, supra,* 83 Cal.App.3d 736, 743; *People* v. *Hartung, supra,* 101 Cal.App.2d 292, 295.) Thus, a court should not instruct that testimony *for* the defense should be viewed with distrust simply because it comes from an accomplice.

Where a codefendant accomplice takes the stand, confesses his guilt, and incriminates his codefendant, then the cautionary instruction must be given. (*People* v. *Catlin, supra,* 169 Cal.App.2d 247, 255) But, where a codefendant testifies in his own behalf, even though that testimony incriminates the other defendant, it is highly prejudicial to the testifying codefendant to give a cautionary instruction, for the jury is then being instructed that the law requires his defensive testimony, and his defense, to be viewed with distrust. (*People* v. *Terry, supra* 2 Cal.3d 362, 399; *People* v. *Gurule, supra,* 236 Cal.App.2d 847, 855; *People* v. *Arends, supra,* 155 Cal.App.2d 496, 513.)

██ Here, each of the defendants testified in his own behalf. Neither confessed his guilt of the charged homicide. However, some parts of Fowler's testimony, if believed, would have supported a finding that Fowler simply participated in a mutual affray, but Barley then got carried away and killed the victim by repeatedly striking him and pounding his head on a concrete step. That evidence could be viewed as self-exculpatory for Fowler, but incriminatory of Barley. Like the defendants in *People* v. *Gurule, supra,* 236 Cal.App.2d 847, Fowler was defending himself by accusing Barley. To disbelieve that evidence was to disbelieve an important part of Fowler's defense—that if any excessive force was used, Barley used it without any help from Fowler. Under these circumstances, the instruction to regard accomplice testimony with distrust told the jury that the law required them to view Fowler's defense with distrust. To instruct a jury to regard a defendant's testimony with distrust is prohibited by the rule announced in *People* v. *Terry, supra,* 2 Cal.3d 362, 399; *People* v. *Gurule, supra,* 236 Cal.App.2d 847, 855; and *People* v. *Arends, supra,* 155 Cal.App.2d 496, 513. The narrow exception to that rule stated in *People* v. *Catlin, supra,* 169 Cal.App.2d 247 where the codefendant confesses on the stand, is inapplicable here. We conclude that the court erred in giving the cautionary instruction.

*People* v. *Flanders* (1979) 89 Cal.App.3d 634 [152 Cal.Rptr. 696] is not inconsistent with this holding. That was a robbery case where a codefendant

accomplice, before trial, pleaded guilty to assault and was then called as a witness by the People. The witness testified favorably to the defendant by testifying that he, the witness, was solely responsible for the assault (he denied the theft) and the defendant was not present. A prior out-of-court statement made by the witness, however, placing the defendant at the scene of the crime was introduced. The trial court modified the cautionary instruction to refer to the prior incriminating statement and instructed the jury that "the testimony *or prior statements* of an accomplice *which tend to incriminate the defendant* . . . ought to be viewed with distrust." (*Id.,* p. 637.) That case is distinguishable from this because there the court's instruction did not ask the jury to view with distrust the testimony of a defendant on trial. Here, the instruction given by the court did tell the jury to view with distrust the testimony of a defendant on trial. It is error to do so.

■ Having found that it was error to give the accomplice instructions when the only accomplices who testified were the defendants themselves, we must determine whether that error resulted in a miscarriage of justice requiring a reversal. (Cal. Const., art. VI, § 13.) A "miscarriage of justice" should be declared only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 470 [110 Cal.Rptr. 906, 516 P.2d 298].)

■ We are persuaded that no miscarriage of justice occurred. The testimony of both defendants was, in many respects, simply contrary to the physical facts. For example, Fowler testified that the fighting took place mostly outside the house. He testified that the victim grabbed the shotgun and broke it outside the house and that no one struck the victim with the gun. Yet, when Beverly arrived on the scene, the Fowler house, 15 to 20 minutes before the defendants placed the victim's body in the car trunk and left, she heard loud voices inside the house, but saw no activity outside the house. The victim's blood was splattered all over the interior of Fowler's house and remnants of the gun stock as well as other pieces of the gun were found in various places inside the house. Blood was found in the crevices of the gun, and blood splatters were found on pieces of the gun stock. The splatters were not blood transfers from a bloody object, they resulted from droplets of blood falling on the stock. Fowler's version of the events surrounding the victim's death was so at variance with the physical facts that it is unlikely that the cautionary instruction given, limited as it was to the portions that incriminated Barley, played any role in the jury's rejection of his testimony. We find the error in giving the accomplice instructions was harmless.

■ Defendants complain that the evidence in the trial court was insufficient to support their convictions of voluntary manslaughter because it did not show that defendants intended to kill the victim. ■ Defendants recognize that before a judgment may be set aside on this ground, " 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.' " (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778]) They recognize that the appellate court must view the evidence in a light most favorable to the judgment and must assume the existence of every fact reasonably deducible from the evidence. (*People* v. *Roberts* (1975) 51 Cal.App.3d 125, 138 [123 Cal.Rptr. 893].)

■ Viewing the evidence in that light, there is ample evidence to support the verdict. The evidence showed that the victim was bludgeoned to death. He had been struck by some blunt force other than a fist, such as a shotgun. From the blood on the shotgun parts and the nature of the injuries, the jury could infer that the victim had been struck with the shotgun. The victim's skull was fractured. His eyes were swollen tightly shut to such an extent that some force had to be used in order to separate the eyelids for eye examination. A number of teeth were knocked out and others loosened. There were multiple rib fractures, both in front and back and on both sides. The injuries to the victim were so severe that the emergency medical technician who responded to the call that night did not recognize the victim even though she was acquainted with him.

In contrast, the defendant Fowler sustained no injury in the incident and the defendant Barley had a little split on his lower lip that did not require any stitches and a few superficial scrapes and bruises on his hands. It was apparent that all of the blood splattered around in the Fowler house was the victim's blood.

When the defendants drove the victim to Webster's house, Fowler opened the conversation by asking where there was a good place to dump a body. Later Fowler admitted that he attempted to shoot the victim with a shotgun, nothing came out, so he beat the victim with the shotgun. The defendants had gone looking for the victim earlier in the evening while armed with that same shotgun.

The massive beating of the victim together with the minimal injuries to the defendants support the inference that the defendants continued to beat the victim long after any possibility of resistance ceased. The evidence supports the inference that, an attempt to kill the victim by shooting him with the shotgun having failed, they simply went ahead and beat him to

death. That the victim, in a semi-conscious state, was able to speak one syllable at a time when the emergency medical technician arrived does not detract from these inferences. The victim died within an hour or two. He was obviously in extremely bad condition. The jury could well infer that the defendants believed (correctly) that they had done all that they needed to do to kill the victim and that death was then imminent. Defendants did nothing to prevent that result, since they walked off, apparently leaving the victim to be found dead in his car trunk.

■ Defendants argue that the trial court erred in refusing to give the following instruction: " 'Voluntary manslaughter is a specific intent crime.' There must be a concurrence of criminal act and a specific intent to kill or the crime of voluntary manslaughter is not committed."

The jury was instructed that voluntary manslaughter requires proof that the killing was done with an intent to kill. Thereafter, the court instructed with CALJIC No. 3.31 as follows: "In each of the crimes of which you have been instructed, there must exist a union or joint operation of act or conduct and a certain specific intent or mental state, or both, in the mind of the perpetrator, and unless such specific intent, or mental state, or both, exists, the crime to which it relates is not committed. [¶] The specific intent and mental state required is included in the definition of the crimes on which you have been instructed."

Thus, the court told the jury that it had to find that the defendants intended to kill the victim in order to find the defendants guilty of voluntary manslaughter. The court did not have to say so again.

■ Finally, defendants contend that the trial court erred in giving an instruction on first degree murder. First of all, if the court erred in that regard, it was harmless, because the defendants were convicted of voluntary manslaughter.

In any event, we find the instruction was properly given. The court was not required to accept the defendants' explanation of why they armed themselves with a shotgun when they went looking for the victim in the late afternoon. The jury might well have believed that the defendants were then in the process of premeditating the killing of the victim. There was no error in giving the first degree murder instruction.

The judgment is affirmed.

Puglia, P. J., and Sparks, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 24, 1988.