Filed 4/13/16  P. v. Conn CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH LEE CONN,<br><br>       Defendant and Appellant. | C073933<br><br>(Super. Ct. No. 11F00158) |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>ARSENIO BARAJAS,<br><br>       Defendant and Appellant. | C074223<br><br>(Super. Ct. No. 11F00158)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 25, 2016, be modified as follows:

1

On page 14, the third paragraph beginning with the word "Furthermore," is deleted and the following paragraph is inserted in its place:

> Futhermore, Barajas's conviction for murder relied on a theory of felony murder in the commission of a burglary; Barajas's intent to use force to take the property was irrelevant. As discussed above, "The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*Chun, supra,* 45 Cal.4th at p. 1182.) Barajas does not dispute that he committed an attempted burglary, and no further intent is necessary to support the conviction for murder. Consequently, any error in giving CALCRIM No. 301 was harmless beyond a reasonable doubt.

There is no change in the judgment.

BY THE COURT:


    /s/
Blease, J.


    /s/
Raye, P. J.


    /s/
Hull, J.

2

Filed 3/25/16  P. v. Conn CA3 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073933 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F00158) |
| v. | |
| JOSEPH LEE CONN, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C074223 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F00158) |
| v. | |
| ARSENIO BARAJAS, | |
| Defendant and Appellant. | |

In this consolidated case, defendants Joseph Lee Conn and Arsenio Barajas appeal from their respective convictions stemming from a murder and brutal beating committed during an attempt to steal money and drugs from their victims' residence.  Conn and

1

Barajas, accompanied by Bryan Smith and Jamie Sandoval, hatched a scheme to steal money and drugs that Sandoval's drug dealer, Danny Fountain, kept in a shed in his backyard. When Danny, his brother Brian Fountain, and their friend Scott Hanson came out to defend their property, a fight ensued which resulted in Hanson's death, and Brian Fountain's severe injuries.

Conn, Barajas, and Sandoval were tried together with separate juries. Bryan Smith pleaded guilty. Charged with first degree murder, attempted robbery, and attempted murder, Conn was convicted of all three counts, while Barajas was convicted of murder and attempted murder, with a mistrial declared on the charge of attempted robbery.

Defendants argue the jury instructions allowed the jury to convict them of first degree murder and attempted murder without a finding of malice. We shall conclude that no finding of malice was necessary, since the only theory of first degree murder and attempted murder presented to the jury was felony-murder. Defendants also argue the trial court should have given a requested instruction on imperfect self-defense. Again, because the murder and attempted murder were committed during the commission of a felony, neither self-defense nor defense of others was relevant or available.

Barajas claims the court incorrectly instructed that his testimony required supporting evidence. We conclude this was error, but was not prejudicial. Barajas claims the trial court was biased in sentencing. Barajas forfeited this claim by failing to raise it below, and it is meritless.

Conn argues that attempted theft is a lesser included offense of attempted robbery, and his jury should have been given an instruction on the lesser included offense. We shall conclude that the court instructed on the lesser included offense of attempted burglary, and there was no evidence the attempted crime was mere theft as opposed to burglary. Conn argues the court erred by denying his request to cross-examine one of the victims in an effort to show the victim was in fact responsible for the murder of Scott

2

Hanson. As there was no direct or circumstantial evidence of third party culpability, the trial court did not err. Conn argues the trial court erred in not granting his request for mistrial. We shall conclude the trial court did not abuse its discretion in determining the offending testimony could be cured by admonition.

We shall affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

Sacramento police responded to 2131 Amanda Way in Sacramento at approximately 4:00 a.m. on New Year's Day, 2011, after receiving a call regarding a felony assault in progress. At the house was Danny Fountain, who had received minor injuries, Danny's brother Brian Fountain, who was seriously injured, their mother Betty Yarberough, and in the backyard of the house Scott Hanson, who was dead.

Danny Fountain lived at the house on Amanda Way with his mother and brother. Scott Hanson lived with them. Danny sold methamphetamine. Codefendant Jamie Sandoval and his girlfriend Tamicia DeSoto were two of Danny's customers. Sandoval and DeSoto knew that Danny kept drugs and money in a wooden box inside the shed in his backyard.

On New Year's Eve, around 6:30 p.m., Sandoval, DeSoto, defendant Joseph Conn and defendant Arsenio Barajas went to Bryan Smith's home. Several other people related in some fashion to Bryan Smith were also there. While they were there, Conn, Bryan Smith, DeSoto, Barajas, and Sandoval started talking about "pull[ing] a lick," slang for committing a robbery. They wanted to get drugs and money. They discussed going to Danny Fountain's house because he had drugs and money, which he kept in a shed in the back of his house.

In the course of the discussion, Conn asked whether they would need weapons, and DeSoto told them they would not need any weapons. However, they fully expected someone to be home. The plan was to get the drugs and money from the shed, but if it was not in the shed, to go into the house. Conn wanted to be the one to go into the

3

backyard because he knew how to break the lock off of the safe. He planned to use bolt cutters to cut the lock off. He carried the bolt cutters, a hammer, and a crowbar in a backpack. Bryan Smith was also planning to go to the backyard, while Barajas and Sandoval were going to stay in the front.

The group did not expect the men in the house (the Fountains & Hanson) to have guns, but they thought the men might defend their property with whatever they could use that was in the backyard. Sandoval and Bryan Smith's father, Tim, sawed the handle off of a pick ax. Bryan Smith put duct tape on the ax handle so it would have a better grip. Conn planned to take the ax handle. He said he would carry it to the backyard with him in case anyone was there. However, Barajas was the one who ended up taking the ax handle. Bryan Smith took an old mop or broom handle to use as a weapon.

Before they left, Conn put on a black beanie, with holes cut for his eyes. Bryan Smith also had a makeshift ski mask made out of a beanie. Barajas wore a dark hoodie and a bandana covering his face.

They all left Bryan Smith's apartment around 2:00 a.m. Before going to the Fountain's house, they went to Michael McNabb's house to switch cars, because Sandoval's truck was too well known in the Fountain's neighborhood. They left DeSoto at McNabb's house to stay and smoke methamphetamine with him.

When the group got to the Fountain home, the plan was for Sandoval to pick up the rest of the group after they had stolen the money and drugs. Conn and Bryan Smith went to the backyard, Barajas stayed in the front. The Fountains' dogs started barking. Although the various accounts were inconsistent, what follows is a reasonable approximation of the melee that ensued. Hanson ran outside, and started fighting Conn and Bryan Smith. Conn hit Hanson in the head with the bolt cutters. Hanson hit the ground. Conn later claimed to have "laid out . . . [¶] . . . [¶] . . . the big white guy" by repeatedly hitting him in the head. Hanson, who was white, was six feet tall and weighed

4

298 pounds. DeSoto, who knew all the occupants of the house, assumed by Conn's description that he had "laid out" Hanson.

Brian Fountain, who saw two people beating on Hanson, came outside, grabbed a two by two piece of wood, and started stick fighting with Bryan Smith. At some point Danny Fountain ran outside. Conn punched Danny Fountain in the mouth. Everyone was swinging and hitting each other. Either Hanson or Brian Fountain got Bryan Smith in a choke hold, and Bryan Smith was screaming for help. Barajas ran to the backyard when he heard Bryan Smith screaming. Barajas hit the person choking Bryan Smith and together with Conn, got the man off of Bryan Smith. Two of the men that had come out of the house were lying motionless on the ground. Conn "pocket check[ed]" both men for anything valuable before leaving. The three intruders ran out of the backyard. Conn left the backpack he had carried in the backyard. Sandoval picked the group up in the car and they drove away.

Afterward, they went back to Bryan Smith's house. Conn was laughing and bragging about hitting Hanson.

The Fountain household had no landline, only Hanson's cell phone and Brian Fountain's cell phone. Danny and his mother were looking through the house for the charger to Brian Fountain's phone, because the phone had to be charged before they could make a call. Danny Fountain went to the next door neighbors' house to call 911. The 911 call came in at 4:20 a.m., and the officers responded at 4:27 a.m.

The cause of Hanson's death was three blows to the back of the head, which fractured the skull and caused bleeding in the brain. The forensic pathologist from the coroner's office opined that there was nothing inconsistent with death having occurred around 4:00 a.m. Brian Fountain suffered multiple lacerations to the scalp, a laceration from the lower right eye extending to mid-forehead, the loss of the right eye due to rupture of the globe, frontal skull fracture and intracranial hemorrhage, and multiple facial fractures.

5

DeSoto pleaded guilty to attempted robbery, assault with force likely to produce great bodily injury, and accessory to murder in exchange for a four year, eight month sentence and her testimony. Bryan Smith pleaded guilty to attempted murder as an aider and abettor, accessory to murder, and attempted robbery, in exchange for and ten-year eight-month prison term and his testimony.

Defendant Conn presented the theory that Hanson was already dead when the defendants entered the Fountain backyard. In support of this he presented the testimony of one of the responding paramedics, who stated that when he arrived at the scene after being dispatched at 4:20 a.m., he raised Hanson's arm and concluded the body was in rigor mortis. That would have meant Hanson had been dead "for a period of time." Conn also produced an expert, Dr. Curtis Rollins, who testified that, having reviewed various reports, he calculated the time of death to be between 10:30 p.m. the prior night and 1:30 in the morning, well before the thieves arrived.

The three defendants, Conn, Barajas, and Sandoval, were tried together with separate juries. All three defendants were charged with first degree murder of Scott Hanson with the special circumstance that the murder was committed during the attempted commission of a robbery, attempted murder of Brian Fountain, and attempted robbery. Conn's jury found him guilty on all counts. Barajas's jury found him guilty of first degree murder and attempted murder, but deadlocked on the special circumstance and the attempted robbery charge. The court declared a mistrial as to attempted robbery and the special circumstance. The trial court sentenced Conn to life without parole plus nine years, and sentenced Barajas to 34 years to life in prison.

DISCUSSION

I

Issues Common to Both Defendants

A.    Because Defendants Were Convicted of First Degree Murder Under a Theory of Felony Murder, the Jury Was Not Required to Find Malice

The trial court instructed the jury that "Homicide is the killing of one human being by another.  Murder is a type of homicide.  The defendant is charged with murder in Count One."  The trial court then instructed the jury on felony murder, indicating that the defendant would be guilty of first degree murder if the jury found the defendant intended to commit robbery or burglary and the victim's death was caused while attempting to commit the robbery or burglary, even if the defendant did not intend to kill the victim. No other theory of first degree murder was presented to the jury.

Defendants now argue that the first degree murder conviction must be reversed because the instructions allowed the jury to convict them of first degree felony murder without first finding that the homicide that occurred was murder because it was committed with malice.

Defendants start with the Supreme Court's statement in *People v. Chun* (2009) 45 Cal.4th 1172, 1183 (*Chun*), that there are no nonstatutory crimes.  They then point to the language of Penal Code section 189 as it sets forth the felony-murder rule.[1]  As is relevant, section 189 provides:  "All murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, . . . is murder of the first degree."  Section 187, in turn, defines murder as a homicide "with malice aforethought."  (§ 187, subd. (a).)  Defendants reason that they cannot be convicted of first degree murder on a felony-murder theory unless the jury first found that the

_____

[1] Further statutory references to sections of an undesignated code are to the Penal Code.

7

homicide that was committed was in fact a murder, and a finding that the homicide committed was a murder required the jury first to find the element of malice.

*Chun* relied on by defendants, refutes their argument. *Chun* stated: "The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*Chun, supra*, 45 Cal.4th at p. 1182.) *Chun* explained that malice is either express or implied. (*Id.* at p. 1181.) Malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) Malice is implied, "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Because the definition of implied malice in section 188 is vague, it requires judicial interpretation. (*Chun,* at p. 1181.) Courts have interpreted implied malice as having both a physical (" 'the performance of "an act, the natural consequences of which are dangerous to life" ' ") and mental (knowing " ' "that his conduct endangers the life of another and . . . act[ing] with a conscious disregard for life" ' ") component. (*Ibid.*)

Thus, the mental component of implied malice (conscious disregard for life) is an interpretation of the abandoned and malignant heart language of section 188. (*Chun, supra*, 45 Cal.4th at p. 1184) "The felony-murder rule renders irrelevant *conscious-disregard-for-life* malice, but it does not render malice itself irrelevant. Instead, the felony-murder rule 'acts as a substitute' for conscious-disregard-for-life malice. . . . 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' [Citation.]" (*Id.* at p. 1184.) Malice is imputed when a defendant commits a felony to prevent the defendant from claiming that he was unaware of the danger to life when he committed the underlying felony. (*Id.* at p. 1182.) " '[B]y declaring the conduct to be felonious, society has warned him of the risk involved.' " (*Ibid.*)

Since *Chun*, the Supreme Court has affirmed that a jury need not find that a defendant acted with malice where the murder charge is based on felony murder. " 'Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. [Citation.]' [Citations.] 'The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it.' [Citation.]" (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

Section 189 directs that burglary and attempted burglary are underlying felonies for purposes of the first degree felony-murder rule. Defendants do not dispute that they committed an attempted burglary. Their intent to commit a burglary was sufficient to impute malice for purposes of felony murder, and the trial court did not err by failing to instruct the jury that it had to find malice.

B.     The Trial Court Correctly Refused to Instruct on Self-Defense

Defendants argue the trial court should have instructed the jury on self-defense and defense of others. By the same reasoning, they argue that the trial court erred when it told the jury in response to a question, that self-defense was not an available defense, and when it failed to instruct on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on imperfect self-defense.

Their reasoning is as follows: They cannot be convicted of felony murder unless the jury first found that the killing was murder. Murder requires that the killing was unlawful. The killing here was not unlawful because defendants were justified in using deadly force in self-defense or the defense of others.

Defendants argued at trial that a species of self-defense instruction should be given because even though the defendants trespassed onto the Fountains' property for the

9

purpose of theft, they were attacked suddenly by the victims, and had the right to act in defense of themselves and of Bryan Smith. Defendants never asserted that the killing of Hanson or the attempt to kill Brian Fountain was justified as self-defense, only that it was imperfect self-defense. Imperfect self-defense is the unreasonable but good faith belief in having to act in self-defense. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Rather than being a perfect defense to murder, it is a mitigating circumstance that reduces an intentional, unlawful killing from murder to voluntary manslaughter because it negates the element of malice. (*Id.* at p. 461.)

The trial court ultimately decided not to give an imperfect self-defense instruction. The court stated that imperfect self-defense did not apply in this situation because the right of self-defense was not available in this situation. Later, during jury deliberations, the Barajas jury sent a note to the court stating: "In the DA's closing arguments she discussed the fact that 'self defense' does not come into play in this case. But we understand closing arguments are not evidence. Are there instructions you can give us that would clarify [whether] defendant[s] in this case are able to act in 'self defense' to get away from victims in the commission of a crime." The court responded that self-defense was not an available defense. The trial court was correct.

Ordinary self-defense, " ' "applicable when a defendant reasonably believes that his safety is endangered--may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." ' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) Where one's own wrongful conduct, including, as is relevant here, the commission of a felony, has created the circumstances leading to the adversary's attack, self-defense may not be invoked. (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

Defendants argue that they had the right to assert imperfect self-defense because the felony they were committing was not forcible and atrocious. This argument is based on *People v. Ceballos* (1974) 12 Cal.3d 470 (*Ceballos*), which held that a defendant who had set up a trap pistol in his garage could not claim self-defense when the pistol shot a burglar. *Ceballos* stated that although section 197 provides that homicide is justifiable when committed in resisting an attempt to commit a felony, if the felony is burglary, the burglary must be of such character and manner that it reasonably creates a fear of great bodily harm before a person may respond with deadly force. (*Ceballos,* at pp. 479-480) Defendants reason that if the felony that is the basis for felony murder is not a forcible and atrocious crime, and the victim of that felony responds with a use of deadly force, such response is unlawful and the defendant has the right to resist the unlawful use of deadly force by self-defense.

Defendants are wrong. As previously explained, the circumstance of felony murder serves to impute the element of malice, obviating the need for the jury to find malice. Self-defense and imperfect self-defense are relevant only to the issue of the existence or nonexistence of malice. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1481-1482.) Since malice is irrelevant to felony murder, so too are the doctrines of self-defense and imperfect self-defense. (*People v. Tabios* (1998) 67 Cal.App.4th 1, 8, disapproved on another point in *Chun, supra*, 45 Cal.4th at p. 1193.)

Even if defendants' reasoning was sound, the victims in this case were justified in resisting the burglary because it was conducted in such a character and manner that it reasonably created a fear of great bodily harm, unlike the burglary in *Ceballos*. The defendants entered the victims' property late at night, armed with weapons, and used those weapons to attack the victims. Conn had bolt cutters, Bryan Smith had a bat, and Barajas had an ax handle. The first victim, Hanson, was unarmed and was outnumbered by two masked and armed burglars. This burglary was performed in such a manner that the victims reasonably feared great bodily harm, and had a right to respond to the force.

11

Defendants' attack being unlawful, they had no right to claim self-defense or imperfect self-defense. A defendant may not claim self-defense or imperfect self-defense where he has "through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), . . . created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S., supra*, 7 Cal.4th 768, 773, fn. 1.)

Accordingly, the trial court did not err, either in refusing to give an imperfect self-defense instruction, or in instructing the jury that self-defense was not available. Likewise, since unreasonable self-defense is relevant only to determine whether malice has been established, limiting the crime to the lesser offense of voluntary manslaughter, and since malice is irrelevant when the charge is felony murder, the trial court did not err in failing to give the lesser offense instructions of voluntary manslaughter and attempted voluntary manslaughter. (*People v. Balderas* (1985) 41 Cal.3d 144, 197.)

## II
## Issues Raised by Barajas

A.     CALCRIM No. 301 Was Not Prejudicial

The trial court gave the following instruction, a modification of CALCRIM No. 301, regarding accomplice testimony: "Except for the testimony of Tamicia DeSoto, Bryan Smith, Arsenio Barajas and Jamie Sandoval which requires supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." Later, the trial court further instructed that if the jury found defendants guilty, then Tamicia DeSoto and Bryan Smith were accomplices. The court further instructed, "You may not convict the defendant . . . based on the testimony of an accomplice alone. You may use the testimony of an accomplice to convict the defendant only if: [¶] One. The accomplice's testimony is supported by other evidence that you believe. [¶] Two. That supporting evidence is independent of the accomplice's testimony, and . . . [¶] . . . that supporting evidence tends to connect the defendant to the commission of the crimes."

12

Barajas testified at trial, giving testimony that was exculpatory to himself and to the other defendants.  He now argues that the instruction that his testimony required supporting evidence to prove any fact diluted the value of his self-exculpatory testimony and effectively reduced the prosecution's burden of proof.**2**  We agree that the instruction was error, but not that it was prejudicial.

Self-exculpatory testimony is not subject to the rule of corroboration.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)  "Accomplice testimony is suspect because, like hearsay, it too may be unreliable.  '[Experience] has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity.' [Citations.]  In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility."  (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967.)  "Where a witness testifies *for* a defendant, the rationale underlying the cautionary instruction no longer applies, so it is usually held that the giving of the cautionary instruction is error. [Citations.]  Thus, a court should not instruct that testimony *for* the defense should be viewed with distrust simply because it comes from an accomplice."  (*People v. Fowler* (1987) 196 Cal.App.3d 79, 87.)

The instruction given by the trial court placed the burden on Barajas to introduce corroborating evidence in order to have the jury consider his self-exculpatory testimony and consequently reduced the prosecution's burden of proof.  (*Cool v. United States* (1972) 409 U.S. 100, 104 [34 L.Ed.2d 335].)  However, the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

---

**2**  Conn initially joined in this argument, but later acknowledged any error did not prejudice him.

13

Barajas's exculpatory testimony centered on his lack of intent to use force in the theft of the victims' property.

Barajas argues this lack of intent would have entitled him to argue self-defense or defense of others pursuant to *Ceballos, supra*, 12 Cal.3d 470. As we have explained, *Ceballos* is not controlling here because the commission of this burglary reasonably created a fear of great bodily harm in the victims.

Furthermore, since the two crimes of which Barajas was convicted, murder and attempted murder, both relied on a theory of felony murder in the commission of a burglary, Barajas's intent to use force to take the property was irrelevant. As discussed above, "The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*Chun, supra,* 45 Cal.4th at p. 1182.) Barajas does not dispute that he committed an attempted burglary, and no further intent is necessary to support the convictions for murder and attempted murder. Consequently, any error in giving CALCRIM No. 301 was harmless beyond a reasonable doubt.

B.    No Judicial Bias

Barajas argues the matter should be remanded for resentencing because the trial court could not be objective when sentencing him.[3] Barajas claims an incident during his testimony resulting in a reprimand from the trial judge rendered the judge biased in sentencing.

Barajas first took the witness stand in front of his own jury, where he testified that sometime in the year before the incident Conn had called him from Colorado and told him he (Conn) was going to kill someone. Conn called him back less than an hour later sounding out of breath, and told him there had been "so much blood." Barajas later took

---

[3] Conn initially joined this argument, but later conceded it did not prejudice him.

the witness stand in front of all three juries, and on cross-examination was asked if he remembered his earlier statement to detectives stating he did not know who had hit one of the victims, but he thought it was Conn. Barajas had said that Conn was hitting everyone really hard, and that Conn had no "remorse for shit like this." Barajas responded that he remembered making the statement, but that it had not been true. The prosecutor then asked if Conn did have remorse when he did "stuff like that." After the court overruled an objection to the question, Barajas responded, "After he told me that he killed that person in Colorado--" Conn's counsel immediately objected.

The trial court sustained the objection, ordered the jury to disregard the statement, and ordered all the juries to step outside. The following exchange ensued:

> "THE COURT: You think that's funny?
>
> "[BARAJAS]: No, sir.
>
> "THE COURT: You're ordered not [to] say that. You're ordered not to even mention anything about that at all. Period. Nothing. You're not going to cause a mistrial if that's what you're trying to do.
>
> "[BARAJAS]: I'm not trying.
>
> "THE COURT: Certainly can't cause a mistrial for yourself anyway. That's not on the table for you. You're not going to do yourself any favors with your jury because your jury's privy to this whole thing and they know dang well you're not saying anything about it because we keep kicking the other jury out.
>
> "Do you want to encourage them to think that you're lying? Do you want to encourage them to think you have no respect for the Court[?] You want to encourage the jury that you have here to just convict you because they're not going to believe anything you say when you do stuff like that? Is that what you want?
>
> "[BARAJAS]: No, sir. [¶] . . . [¶]
>
> "[COUNSEL FOR BARAJAS]: I think the issue is on this remorse has to do with the Colorado issue and that's why [Conn's counsel] objected.

15

"THE COURT: No. No. No way. That question is as clear as can be. Did he have no remorse. His answer was not even responsive to her question. His answer -- her question was, do you not have any remorse, is that true. He has no remorse. His answer is yes or no to that. [¶] . . . [¶] . . . He . . . never had to touch the Colorado issue. [¶] . . . [¶] . . . The answer was not called for. The question did not call for that answer. I mean he deliberately stated that. It's very clear to me he deliberately stated that. [¶] . . . [¶]

"You know we've gone over and over this. We have three juries so he doesn't say this kind of stuff. We all know this is always a problem. He testifies in front of three juries and [Conn's counsel's] going to make a mistrial motion which I'm going to deny but she's going to make it. She has to. [¶] . . . [¶]

"These are always the danger with three defendant cases. We've taken efforts. This defendant has been here -- has been here throughout this entire thing. He understands the importance of why we have them separated. He understands the importance of the issue in Colorado, how it should never be mentioned.

"And I am making a finding that I think he deliberately, I have no doubt in my mind that he deliberately stated the Colorado, brought up the Colorado issue. It was not responsive to the question asked and he did it solely for the purpose of either trying to cause a mistrial or he did it to -- either for himself or for the other defendants; I'm not sure which.

"But I think the record is very clear that what he did was deliberate. He sat through every single one of those sessions we've had, where we're all outside the presence of the [juries] carefully gone through what can and cannot come in front of each jury.

"And so he thinks he's apparently smarter than the rest of us and can pull things like that. And I wouldn't be surprised if he does it again. But we'll see how that -- what happens on that issue. [¶] . . . [¶]

"I am ordering you again, Mr. Barajas, you may not mention no matter what you think the question is it never calls for Colorado response. Nothing about anything to do with Joseph Conn's prior -- his stay in Colorado, what he may have told you about the prior homicide, about killing anybody.

"No question anybody asks here is ever calling for that answer when we have both of these juries or all three juries present. And so I am directly

16

ordering you not to do that again. If you violate that order there are a variety of contempt issues the Court has in its power. I can remove all of your good time credits up to this point. Then accumulated in county jail. There are a variety of other issues the Court may consider."

Later at sentencing, Barajas gave a statement in which he emphasized that he had been convicted of murder even though he had not killed anyone. Barajas's attorney asked the trial court to sentence him to the lower term for attempted murder and concurrently for the murder and attempted murder because of his limited involvement in the crime and the continuous nature of the conduct.

In response, the trial court stated: ". . . I watched this trial, and I watched it from start to finish. I watched your statement to the police. I watched . . . you take the stand, and I watched you lie for hours on the stand. [¶] . . . I didn't believe much of anything of what you said. [¶] And so you can try to take the position that you've got no responsibility in this case. But I've read this probation report, and you've been dodging responsibility since you were a young man. [¶] . . . [¶] But I heard testimony here where you . . . did burglaries with Mr. Smith. You routinely committed crimes. You were committing crimes all the time with the -- Smith, Mr. Conn, all leading up to this incident here. [¶] And the idea that you're going to portray yourself as some sort of victim because you -- you were dragged into this, your children were taken from you, you were dragged into this by Mr. Conn. [¶] You have no absolutely no insight whatsoever to the fact that you made these choices. . . . [¶] . . . [¶] You were the one that decided to go to this robbery and stand up outside so when this -- and when this thing went bad, you were the one who went back there armed, ready to do whatever was necessary to extricate your friend so that they could get away with this crime. [¶] So you are 100 percent responsible in every respect to this. And you got exactly what you deserved, which was a conviction for first degree murder. [¶] And you are going to get exactly what you deserve, which is spending the [rest] of your life in prison."

17

The trial court sentenced defendant to the upper term of nine years for the attempted murder, citing the reasons that: (1) Barajas was on probation at the time of the incident, (2) he had prior convictions that were of an increasingly serious nature, and (3) the crime was brutal and callous. The court imposed consecutive sentences because the attempted murder was separate from the murder.

Barajas now argues that because of Barajas's prohibited response to the prosecution's question on cross-examination, the trial court was biased when it sentenced him. Barajas forfeited this claim of judicial bias by not raising it below. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110.) Barajas argues he raised the issue by requesting concurrent terms and the low term on the attempted murder. The request in no respect raised the issue of judicial bias. In any event, the claim is also meritless.

Barajas has the burden of establishing facts to support his position. (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 926.) Neither the trial court's rulings against a party, nor its expressions of opinion based on observation of the witnesses and evidence demonstrates bias. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

The trial court's comments when sentencing Barajas constituted no more than its expressions of opinion based on the observation of the evidence and witnesses, and did not demonstrate bias. The reasons given by the trial court to support its sentencing choices were appropriate and reasonable. The reasonableness of the sentence is evidenced by the fact that it was recommended by the probation report. Barajas has failed to establish the trial court was biased in sentencing.

### III
### Issues Raised by Conn

A.    The Court Was Not Required to Instruct on Attempted Theft

Conn was convicted of first degree murder while engaged in the attempted commission of a robbery, attempted murder, and attempted robbery. He argues the theft

18

only became an attempted robbery when force was applied after the theft was interrupted and abandoned. He argues the jury should have been given an instruction for attempted theft as a lesser included offense of attempted robbery.

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation] which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citations]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) Conversely, "the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense." (*People v. Kelly* (1990) 51 Cal.3d 931, 959.)

In this case, the trial court instructed the jury on robbery, attempted robbery, burglary, attempted burglary, and theft. The theft instruction was given to explain burglary, which required entry into a building with the intent to commit theft.

The trial court was not required to instruct on attempted theft because attempted burglary was the only possible lesser included offense to attempted robbery. The evidence indicated the defendants intended to steal money and drugs from the victims, and that they expected the money and drugs to be located in a shed behind the house. A burglary is committed when a person enters, inter alia, a house, outhouse, or other building with intent to commit a felony. (§ 459.) A building is generally defined as a place that has walls on all sides and is covered by a roof, although this definition has been broadly construed. (*People v. Labaer* (2001) 88 Cal.App.4th 289, 296.) The Supreme Court has defined a building as an enclosed area "into which a reasonable person would believe that a member of the general public could not pass without authorization." (*People v. Valencia* (2002) 28 Cal.4th 1, 11, disapproved on another point in *People v. Yarbrough* (2012) 54 Cal.4th 889.)

Here, the shed that the defendants intended to break into was about four feet by six feet, had a door that could be and was locked, and had a roof. This was a building for purposes of the burglary statute. There was no evidence that the defendants expected to steal property from anywhere but inside the shed or the house. Thus, the evidence was such that the defendant, if guilty at all, was guilty of either attempted burglary or attempted robbery, and the trial court instructed on both theories. No attempted theft instruction was required.

B.      Court Properly Excluded Third Party Culpability Evidence

Conn claims the trial court erred by excluding "evidence about animosity between the male members of the Amanda Way household . . . ." He claims the exclusion of this evidence violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and his right to introduce relevant evidence under article I, section 28, subdivision (d) of the California Constitution.[4]

Conn's counsel made a motion to allow the cross-examination of Danny Fountain regarding family dynamics. During Danny's interview with police he repeatedly brought up disagreements he had with Brian Fountain and Hanson. He said that they had no morals, that they lied, and that they were thieves. Danny felt that Brian was freeloading off of him. During Danny's testimony, he indicated he had a problem with his brother Brian taking his "stuff" without permission. The night of the murder, Hanson was supposed to have gone to pick up some money for Danny, and Danny was annoyed that he took hours to return.

---

[4] This claim with respect to the California Constitutional provision makes little sense. Section 28 of article I of the Constitution is a victim's rights provision. Subdivision (d) in particular states: "The granting of these rights to victims shall not be construed to deny or disparage other rights possessed by victims. The court in its discretion may extend the right to be heard at sentencing to any person harmed by the defendant. The parole authority shall extend the right to be heard at a parole hearing to any person harmed by the offender."

20

Conn's counsel wanted to cross-examine Danny on his relationship with his brother and with Hanson to show that Danny killed Hanson earlier in the evening, and that Hanson was dead when the defendants arrived.

The trial court denied Conn's motion to introduce evidence of third party culpability, stating: "[Y]ou think you can establish motive and opportunity, basically. But the motive . . . is slim to nonexistent . . . and the opportunity is no different than almost any crime scene where you have people together at the same area. I mean he was living at the same house, so of course, you have opportunity. [¶] . . . [¶] They're probably stealing his meth or his money or both and it makes him mad. . . . Really that's really all that you have to go from there to say that -- to then point the finger at him and say he's the killer." The trial court did, however, allow Conn to produce his own expert to say that Hanson's death occurred hours before the defendants arrived at the Amanda Way house.

To be admissible, third-party culpability evidence "need only be capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) Evidence that shows nothing more than motive and opportunity does not raise a reasonable doubt. (*Ibid*.) "[T]here must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid*.)

The only information Conn provided was that Danny may have been mad at Hanson, and thought his brother and Hanson were thieves. The trial court correctly determined that such evidence was nothing more than motive and opportunity, and as such did not raise a reasonable doubt of his guilt. There was no direct or circumstantial evidence linking Danny to the murder of Hanson. The trial court did not err in excluding the testimony.

Conn's federal constitutional and state constitutional claims are likewise without merit, as the ordinary rules of evidence do not impermissibly infringe on his state or federal constitutional right to present a defense. (*People v. Prince* (2007) 40 Cal.4th

1179, 1243.) Moreover, Conn was able to present a defense. He presented his own expert to testify that his time-of-death calculations indicated Hanson died before the defendants came to the house. The paramedic's testimony was consistent with this. He presented the testimony of Danny's neighbors to testify to inconsistencies in Danny's account of where the fight occurred. He presented the testimony of Officer Brian Bell to refute Danny's claim that he had thrown an object at the neighbor's house during the fight in order to get their attention. His attorney cross-examined Danny about being annoyed with Hanson that night because Hanson took so long to come back with Danny's money. Conn's attorney argued Danny was responsible for the murder in her closing argument. Conn was not prevented from presenting his defense.

C.    Motion for Mistrial Properly Denied

Conn argues the trial court abused its discretion when it denied his motion for mistrial following Barajas's statement that Conn "told me that he killed that person in Colorado . . ." There was no abuse of discretion.

As soon as Barajas made his statement, Conn's counsel objected, the trial court sustained the objection, and added, "The jury's ordered to disregard that." Outside the presence of the jury, Conn's counsel moved for a mistrial, and added that if the court denied the mistrial, "then I would just simply ask the Court to just admonish the jury, to disregard -- just disregard the last answer and not reiterate what the answer was." The court denied the mistrial motion and admonished the jury when it returned as follows: "At this time you are ordered to disregard the last statement or answer to the question made by Mr. Barajas. You're ordered to disregard it 100 percent. Treat it as if you never heard the answer in any way. [¶] Do not speculate as to the answer in this case. I'm striking it from the record. That means that you never consider it for any purpose in your deliberations. [¶] Furthermore, do not discuss what happened in any way with each other, whether you're from the same jury or from any other jury. And this is the same for all testimony."

22

Conn argues the trial court abused its discretion in denying the motion for mistrial, and argues the admonition given the jury was not effective in preventing prejudice.

The denial of a motion for mistrial is reviewed for abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984.) A motion for mistrial should be granted only if the trial court, " ' "is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In other words, a mistrial is to be granted only when the party's chances of receiving a fair trial have been irreparably damaged. (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) It is only the exceptional case in which the improper matter is of such a character that its prejudice cannot be removed by the trial court's admonitions. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1429.) " 'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured. [Citations.]' [Citation.]" (*Id.* at pp. 1428-1429.)

The trial court instructed the jury to disregard Barajas's comments, and as there were no indications to the contrary, we assume the jury followed the trial court's instructions. (*People v. Williams* (2015) 61 Cal.4th 1244, 1280.) This was not a case in which a defendant of sterling character was accused of committing a crime that was inconsistent with his reputation as a law-abiding citizen. Whether Conn had committed a prior murder was not a fact that would prejudice the jury in this case, where he was charged with felony-murder and there was overwhelming evidence that an underlying felony was committed and that a person died during its commission. The trial court did not abuse its discretion in denying the mistrial motion.

D.      No Cumulative Error

Conn argues the cumulative effect of the multiple errors was prejudicial.  Since we have found no error, we reject the claim.  (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

DISPOSITION

The judgment is affirmed.


                                      /s/
                                      Blease, J.


We concur:


  /s/
Raye, P. J.


  /s/
Hull, J.