Filed 10/28/21  P. v. Talamantes CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B303557 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA471338) |
| v. | |
| JOSE LUIS TALAMANTES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Affirmed as modified.

Vincent C. Chan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

The Los Angeles County Sheriff's Department (LASD) raided a commercial building where the defendant, Jose Luis Talamantes, lived in one of the suites. Deputies found drugs, drug paraphernalia, firearms, and ammunition in the building, including in the suite where defendant was living and in a nearby suite with a desk bearing defendant's gang moniker. Defendant had a large amount of cash in his pocket when he was detained. A jury found defendant guilty of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)[1]), possession of methamphetamine for sale (Health & Saf. Code § 11378), and unlawful possession of ammunition (§ 30305, subd. (a)(1).) The court sentenced defendant to nine years in prison.

On appeal, defendant asserts four errors. First, he contends the trial court erred in limiting its review of the investigating deputy's personnel records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), and he asks us to conduct an independent review of the in-camera *Pitchess* hearing to determine if any relevant personnel records were incorrectly withheld. We find the court did not limit review of the personnel records, nor did it abuse its discretion in the *Pitchess* hearing.

Second, defendant contends the court erred in allowing the investigating deputy to testify that he received certain information from a confidential informant. We find that if any error occurred in the admission of this testimony, it was invited by defense counsel and it was harmless.

Third, defendant contends he is entitled to one extra day of custody credit; the Attorney General concurs. We agree

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defendant is entitled to the additional day of custody credit, and therefore order that the abstract of judgment be amended to reflect this correction.

Fourth, defendant contends the trial court should not have imposed fines and fees without first holding a hearing to determine defendant's ability to pay. We find that defendant forfeited this contention by failing to assert it below.

We therefore order that the abstract of judgment be amended to reflect the corrected custody credits, and in all other respects affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The People filed an information on January 4, 2019, charging defendant with five felonies: possession of a firearm by a felon (§ 29800, subd. (a)(1), count 1); possession of a controlled substance (methamphetamine) for sale (Health & Saf. Code § 11378, count 2); possession of a controlled substance while armed with a firearm (Health & Saf. Code § 11370.1, subd. (a), count 3); unlawful possession of ammunition (§ 30305, subd. (a)(1), count 4); and second degree commercial burglary (§ 459, count 5). For each count, the information included a gang allegation (§ 186.22, subd. (b)(1)(A)), a prior strike allegation (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)), and an allegation that defendant had served three prior prison terms (§ 667.5, subd. (b)).

Defendant pled not guilty. The burglary charge, count 5, was dismissed before trial. Defendant filed a *Pitchess* motion before trial, which we discuss in further detail below. The following evidence was presented at trial.

A. *Prosecution evidence*

Diego Robles, defendant's probation officer, testified that beginning in 2018, defendant reported that his address was 4532

3

East Whittier Boulevard, unit 201.  Defendant said he was working at the building as a manager; Robles assumed the property was an apartment complex.  Defendant also told Robles that he used to be part of the Marianna Maravilla gang, his moniker was "Slayer," and he was no longer active in the gang.

LASD deputy Juan Sanchez testified that he had contacted defendant approximately 20 times over the past three and a half years.  Defendant told Sanchez he was in the Marianna Maravilla gang and his moniker was Slayer. Sanchez also observed Marianna Maravilla gang tattoos on defendant's body. LASD sergeant and gang expert Rafael Rufino testified that the Marianna Maravilla gang engaged in graffiti, vandalism, theft, possession of firearms, narcotics sales, shootings, assaults, murder, mayhem, "and other violent crimes."

LASD deputy Ricardo Munoz testified that he is a member of LASD's Special Enforcement Bureau, which "is a fancy way of saying SWAT."  Munoz was involved in the search of 4532 East Whittier on September 11, 2018.  He testified that LASD had a warrant to search approximately six units in the building. Munoz testified that 30 to 40 SWAT deputies participated in serving the warrant and securing the building; another group of investigating deputies was also there to search the building.  The Special Enforcement Bureau was asked to serve this search warrant "because it rose to a high-risk level," which typically occurred when a person was wanted for a serious felony or the person was known to be armed.  Munoz continued, "And in this case, because of the building and the crimes, we were asked to serve the search warrant."  Munoz explained that his team "would not touch any evidence. That's not our purpose for being there. We are looking for persons or bodies. We're there to make

4

the location secure for investigating officers to be able to come in and conduct their searches."

Munoz testified that the LASD team arrived at 4:30 a.m. on September 11, 2018. The team realized they "had been compromised" when a person "in the second floor stairwell door . . . saw the armed vehicles coming down the alley and ran inside and closed the door behind him." Munoz and the other team members "made our way up the stairs as quicky as we could." Munoz's team entered the building through a door on the second floor, while other teams went in though other entrances.

Munoz testified that the door to suite 202, the corner suite, was "ajar approximately 56 inches," and no one was inside. Munoz and his team cleared the even-numbered suites on the west side of the building; they found people in suites 204 and 208. Other teams cleared the remaining suites. Approximately 20 people in total were detained at the site.

LASD detective Michael Deschamps, the investigating officer for the case, testified that he was a member of the Operation Safe Streets Bureau, which investigates gang-related cases. Deschamps had been at 4532 East Whittier several times: while investigating gang-related shootings at the location, responding to calls from patrol officers after gang members with firearms disappeared into the building, and executing a previous search warrant. Deschamps authored the search warrant in this case and was present when the warrant was served on September 11, 2018. Defendant was "one of the main subjects" of the search; deputies were also looking for "gang members from Marianna Maravilla who are in possession of firearms and narcotic[s]." Deschamps testified that the warrant was based on information from "a credible, reliable informant."

Deschamps testified that he and other gang unit detectives "provided the containment" while Munoz and other special enforcement bureau members entered the building. The building was cleared within about 20 minutes; defendant and his girlfriend, who lived together in suite 201, were among the people detained. Deschamps and a team of about 10 investigators then searched the building, including the suites on the first and second floors. In suite 201, he found a woman's purse that held what appeared to be methamphetamine, glass pipes, a cellular provider receipt with defendant's name, and a bail bond receipt with defendant's name. Deschamps testified that the room had ceiling tiles that were "displaceable" in that they could be pushed upward. Above the ceiling tiles of suite 201 was a black bag containing baggies of a crystalline substance that appeared to be methamphetamine, glass vials of liquid that appeared to be PCP, a glass pipe, and tobacco or marijuana "wraps."

Deschamps testified that suite 202 was a large corner suite 15 or 20 feet away from suite 201. A desk in suite 202 had on it a birthday-style banner with letters spelling out "Slayer," and a globe that had the name Slayer. A placard on the desk stated, "Dungeon Apartments General Manager, Slayer. Fuck what you're going through. No llores." Deschamps testified that "no llores" means "no crying." The desk contained glass methamphetamine pipes, digital scales, clear plastic baggies, heroin, a firearm, ammunition of various calibers, and an electronic benefits transfer (EBT) card with defendant's name on it. The firearm in the desk was an operable and loaded .45 caliber Sig Sauer, which was inside an unlocked gun case in a desk drawer. The gun was shown to the jury. On a shelf five or six feet away from the desk was a clipboard displaying gang

graffiti and a list of the monikers of Marianna Maravilla members, including Slayer. Several of the people listed on the clipboard were detained during the search. Above the ceiling tiles of suite 202 was a gallon-size bag containing about a pound of methamphetamine, and a butane lighter with "Slayer" engraved on it. Deschamps explained that butane lighters are commonly used to smoke methamphetamine, and the hard plastic of the lighter is used to break large chunks of methamphetamine into smaller pieces for sale.

Deschamps testified that he also searched defendant's person. In defendant's right front pants pocket was approximately $1,500 in cash, including many $20 bills that were "folded by themselves and stacked on top of other folded 20's and turned in different directions." Deschamps believed the individually folded $20 bills were likely "received in exchange for an amount of methamphetamine" because "$20 is a common denominator [*sic*] when selling small amounts of methamphetamine to others." The pound of methamphetamine, scales, empty baggies, glass pipes, and cash led Deschamps to believe that the methamphetamine was possessed for sale.

In suite 211, Deschamps witnessed a "male Hispanic adult that was reaching in the ceiling tile," and it looked like "he was either retrieving or placing an object within the ceiling tile." Upon searching the ceiling, Deschamps found a loaded 12-gauge shotgun wrapped in a blanket. In suite 204 Deschamps found a "blank firearm," a movie prop that looks and sounds like a real firearm, but uses blank bullets and has a "hard metal object within the barrel" to prevent anything from going through the barrel. Deschamps also testified that as deputies entered the building, a man jumped from a second-floor window to the roof of

7

the adjacent building.  The man, a member of Marianna Maravilla, had a black bag that contained methamphetamine and three glass pipes.

On the rear of the building there was graffiti, about 15 feet long by five feet high, reading "MMV."  Deschamps testified that MMV was an abbreviation for Marianna Maravilla.  Deschamps also testified generally about gang culture, gang monikers, and the Marianna Maravilla gang.  The jury was shown photographs of defendant's tattoos, including two Ms and "MMV," which Deschamps testified showed that defendant was a member of the Marianna Maravilla gang.  Deschamps also provided information from defendant's Facebook account, which included defendant's name; his moniker, Slayer; photographs of him; the tag line "Life is marvelous, baby"; and other posts including the word "marvelous."  Deschamps testified that "Life is marvelous" and other uses of the word "marvelous" are common tag lines for Marianna Maravilla gang members.  Deschamps  opined defendant was a member of the Marianna Maravilla gang and the crimes committed were for the benefit of the gang.

On cross-examination, Deschamps admitted that he did not know who placed any items in any of the suites.  This testimony is discussed in further detail below. Deschamps agreed that suite 202 was cluttered, and the desk drawers were unlocked. Deschamps said he did not ask any of the detained people about the clipboard found in suite 202.  Deschamps agreed that defendant's Facebook page included information that defendant had worked as a carpenter and plasterer.

B.    *Defense evidence*

Alondra Lomeli testified that she was the assistant program director for a DUI education program that had operated

out of suite 210 of the 4532 East Whittier building from 2004 to March 2019.  Lomeli testified that another business had operated out of suite 203.  Lomeli testified that she was typically in the building from 9:00 a.m. to 5:00 p.m., Monday through Wednesday.  She said she knew defendant; the building owner had introduced him as the manager of the building.  When asked about defendant's role at the property, Lomeli replied, "If I needed anything through the office, anything that is related to the office or outside restrooms or parking, to contact him."  Lomeli testified that defendant had the restrooms cleaned and stocked, addressed parking issues near the building, painted and touched up the hallways, addressed plumbing issues, and tore out carpets so tile could be installed.  Lomeli said defendant had been the manager for about a year, and he was "always professional."

Lomeli said she was aware that some people lived in the building; she did not know whether defendant lived there.  She did not observe any illegal activity in the building.  Lomeli stated that she once went into suite 202 "to get water because sometimes [defendant] had water and a microwave, a coffee mug for everyone to go in there if we needed anything."  She said suite 202 contained "the tools that [defendant] worked with, paint, just stuff to work in the building."  Lomeli testified that the door was always open and she would see people go in and out of the suite.  She could not remember what month or year she entered suite 202, but thought it was before September 11, 2018.  When shown a picture of the desk in suite 202, Lomeli did not recognize it.  She said that when she had looked into the room, it was clean and not cluttered.

Gang expert Martin Flores testified about the history of the various Maravilla gangs in east Los Angeles.  He stated that in

9

gangs generally, "you have both a criminal aspect of the gang, then you have the noncriminal aspect," which involves social interaction. Flores said a small percentage of gang members commit the majority of crimes, but he did not know specific percentages. He also testified that not all members of gangs remain members for life. Flores said gangs sometimes move into abandoned buildings, but it would be uncommon for a gang to take over "an active functioning building." He also stated that a person can be an active gang member but not engage in criminal activity. He further testified that not all crimes committed by gang members are committed for the benefit of the gang. On cross-examination, Flores admitted that in gang cases he has testified only for the defense.

Defendant did not testify.

C. *Verdict and sentence*

The jury found defendant not guilty of possession of a controlled substance while armed with a firearm (Health & Saf. Code § 11370.1, subd. (a), count 3), and guilty of the remaining three counts: possession of a firearm by a felon (§ 29800, subd. (a)(1), count 1); possession of a controlled substance (methamphetamine) for sale (Health & Saf. Code § 11378, count 2); and unlawful possession of ammunition (§ 30305, subd. (a)(1), count 4). On counts 1, 2, and 4, the jury found the gang allegations true. (§ 186.22, subd. (b)(1)(A).) Defendant admitted his prior convictions and strike.

The court denied defendant's *Romero*[2] motion, and sentenced defendant to a prison term of nine years, calculated as follows: on count 1, the high term of three years, doubled

_____

[2] See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

10

pursuant to the Three Strikes law, plus three years for the gang allegation; on count 2, a concurrent term of three years, plus three years for the gang allegation; and on count 4, a concurrent term of three years, plus three years for the gang allegation. The court gave defendant credit for 428 actual days of custody. The court imposed various fines and fees, which are discussed in further detail below.

Defendant timely appealed.

## DISCUSSION

Defendant asserts four main errors on appeal. First, he contends the trial court erred in limiting its review of deputy Deschamps's personnel records under *Pitchess*; second, he contends the court erred in allowing certain testimony from Deschamps; third, he argues he is entitled to one additional day of custody credit; and fourth, he contends the trial court should not have imposed fines and fees without first holding a hearing to determine defendant's ability to pay. We find that defendant was entitled to one additional day of custody credit, and reject his remaining contentions.

A.    *Pitchess*

1.    *Background*

Before trial, defendant filed a *Pitchess* motion asserting that Deschamps had engaged in acts of misconduct, and seeking discovery of personnel files "relating to accusations that [Deschamps] engaged in acts of excessive force, bias, dishonesty, coercive conduct or acts constituting a violation of the statutory rights of others." Defendant asserted that Deschamps wrote in his incident report that when he interviewed defendant after the raid on September 11, 2018, defendant said the desk in suite 202 and all of its contents were his. Defendant argued that

Deschamps "was being untruthful" regarding the contents of the desk and defendant's statements. The People opposed the motion, asserting that defendant failed to show good cause for the discovery or materiality of the records requested, and that the requested categories of documents were overbroad. (See *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 [a motion for discovery of officer personnel records must show good cause for the discovery "by demonstrating the materiality of the information to the pending litigation"]; § 1043, subd. (b)(3).)

At the hearing on the motion, defense counsel offered to provide the court with the recording of Deschamps's September 11 interview with defendant. The court declined, stating, "The reason I don't need to listen to it is that it is set forth in the opposition [*sic*] that Mr. Talamantes denied what is set forth in the report in many respects. So I don't really see the necessity of having to listen to it. I accept the representation set forth and filed by" defendant. The court continued, "I'll review the records in the following categories: false report writing and because he testified at the preliminary hearing of perjury. The other categories I do find to be appropriate."

At the in-camera hearing, an LASD custodian of records was sworn and testified that she searched for all relevant records. The court reviewed the information produced, and found it was not applicable. The court sealed the record of the proceeding.

In open court, the court stated, "Following the in-camera review of the records that were determined to be appropriate for the in-camera hearing, the court has found no discoverable information." The minute order for the hearing states that the court "finds good cause has been shown for in camera review of

12

the requested information as specified by the court," and, "After in-camera review of the documents, the court finds no hits."

2. *Analysis*

Defendant asserts the court "erred in limiting the scope of in camera review to 'false report writing and perjury – refusing to include reports of bias or dishonesty as requested in the motion." The Attorney General asserts that defendant's position is based on a misreading of the record, because "[n]othing in the record indicates the trial court limited its review of the detective's personnel file in any way." "*Pitchess* rulings are reviewed for abuse of discretion." (*People v. Winbush* (2017) 2 Cal.5th 402, 424.)

We agree defendant's contention is not supported by the record. In granting defendant's motion, the court stated, "I'll review the records in the following categories: false report writing and because he testified at the preliminary hearing of perjury. The other categories I do find to be appropriate." Although the court's statement as transcribed is somewhat awkward, the court stated that it found the categories "appropriate." The minute order also stated that "good cause has been shown for in camera review of the requested information." The court did not state that the motion was being partially denied, nor it did state that any requested category of information would not be reviewed. Defendant has not demonstrated that the trial court limited its review of the personnel records or abused its discretion in granting the *Pitchess* motion.

Defendant also asks that this court conduct an independent review of the in-camera hearing to determine if any relevant personnel records were incorrectly withheld. The Attorney General does not oppose this request.

13

"When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed." (*People v. Winbush, supra,* 2 Cal.5th at p. 424.) At an in-camera *Pitchess* hearing, "[t]he trial court should . . . make a record of what documents it examined before ruling on the *Pitchess* motion. . . . [T]he court can . . . state for the record what documents it examined." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.) An appellate court independently examines the record made by the trial court "to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

We have reviewed the sealed transcript of the in-camera hearing. The court complied with the procedural requirements for a *Pitchess* hearing, including providing an adequate description of the documents reviewed. The court did not abuse its discretion in finding no discoverable information.

B.      *Deschamps's testimony about the firearm in the desk*

Defendant asserts the trial court erred in allowing Deschamps, "a professional witness," to "blurt[ ] out devastating hearsay – that he had heard from multiple sources that [defendant] had placed the gun in Suite 202." Defendant contends this error was "amplified by the trial judge's erroneous rulings" with respect to the testimony and defense counsel's attempts to further question Deschamps about the confidential informant. The Attorney General asserts that the trial court's rulings were not erroneous, and to the extent any error occurred, that defendant invited it and it was harmless. "We review a

14

ruling admitting evidence over a hearsay objection for abuse of discretion." (*People v. Roberts* (2021) 65 Cal.App.5th 469, 477.)

1. *Background*

At the preliminary hearing in December 2018, Deschamps testified that about a week before the warrant was served, the owner of the building reported to LASD that he was having problems with Marianna Maravilla gang members living in the building. In May 2019, just before trial began, the court and parties were discussing whether the owner of the building was going to testify. The prosecutor noted, "[T]he comments from the owner, . . . that was just one of the factors that went into the search warrant. The majority of which was the fact that they had gotten news that there were individuals who had guns and drugs at this location."

On direct examination at trial, the prosecutor asked Deschamps what led to LASD obtaining the search warrant for the building. Deschamps stated that defendant was "one of the main subjects" of the search warrant, as well as other "gang members from Marinna Maravilla who are in possession of firearms and narcotic[s]." The prosecutor asked, "What information did you get that caused you to write this search warrant and then execute it?" Deschamps briefly discussed how LASD gang investigators gather intelligence relating to gang activity, and stated, "Sometimes people give us anonymous tips, but in this case, I had what we call a credible, reliable informant who gave me this information." Defense counsel did not object.

On cross-examination, defense counsel focused heavily on Deschamps's lack of personal knowledge about how the various items arrived at the places they were found. For example, defense counsel asked, "You don't know who placed those items in

15

the suite that were not found on people's persons.  You don't know how those were placed there, do you?"  Deschamps replied, "I mean, no, I don't."  Referring to the gun found in suite 202, defense counsel asked, "Do you know for sure how that gun got in that suite?"  Deschamps replied, "I don't."  Counsel also had Deschamps admit that he did not know when the ammunition was put in the desk, who put the digital scales in suite 202, who owned the glass pipes, or what the other detained people had been doing before deputies arrived.  Deschamps agreed that the door to suite 202 was open when he arrived and that the desk drawers were unlocked, implying that others had access to the suite and desk.

The following exchange also occurred on cross-examination:

"Q [by defense counsel] And you don't know when the gun that was placed in suite 202 that was found in the desk was placed there?

"A [by Deschamps] I do not know.

"Q     You don't know if it was there for days; correct?  You don't know?

"A     No, I don't.

"Q     You don't know if it was there for months?

"A     Well --

"Q     Do you?

"The court: Let him answer the question before you ask another one, please.

"The witness:  I know it was there for approximately a day.

"Q     How do you know it was there for approximately a day?

"A     Because the information I obtained was that the defendant had just obtained that firearm."

16

Defense counsel then said, "Objection." The prosecutor pointed out that defense counsel had asked the question. The court said, "Your objection to the witness's testimony is overruled based on the fact that you opened the door by asking the question." Defense counsel continued:

"Q    Are you going to tell us the source of your information?

"A    No.

"Q    So we have no way of knowing?

"A    For their protection, no.

"Q    Is the information simply that you yourself are suspicious of Mr. Talamantes?

"A    No, not at all."

After discussing the ammunition found in the desk, defense counsel again asked Deschamps to confirm that he did not personally witness the gun being placed in the desk. Deschamps said, "That is correct." Defense counsel then asked, "We have no basis of determining how reliable your source is because you don't want to name the source; correct?" The court interrupted, stating, "I'm sorry. That's an inappropriate question." The court then ordered the noon recess.

When cross-examination resumed that afternoon, defense counsel asked Deschamps, "You said that you had some prior knowledge of Mr. Talamantes based on information you received from a source you wanted to protect; is that correct?" Deschamps began to answer, "From many sources. . . ." but the court interrupted, "I think the – I prefer you not tread into this area. . . . It is not necessarily the witness's preference. It is also perhaps a legal requirement, and it is legally protected."

17

2. *Analysis*

Defendant argues that Deschamps's statement that defendant had recently obtained the firearm was inadmissible hearsay, and the trial court erred in overruling his objection on the basis that defendant opened the door by asking the question. Because the trial court prevented defense counsel from questioning Deschamps about the confidential informant thereafter, defendant asserts that the court "compounded the error when it protected the secrecy of the source without so much as a hearing on disclosure." He also asserts that the information should have been provided in discovery.[3]

The Attorney General asserts that any possible error was invited when defense counsel asked Deschamps a question that "called for a response based on hearsay." The Attorney General also contends the trial court acted within its discretion by instructing defense counsel to refrain from questioning Deschamps about privileged information.

"'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel

---

[3] Defendant also contends, in a single sentence, that "this tactic" violated the Confrontation Clause of the United States Constitution (U.S. Const. Amend. VI), and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). It appears that "this tactic" refers to maintaining the confidentiality of the informant. Defendant does not include any further discussion supporting these points. "If a party's briefs do not provide legal argument and citation to authority on each point raised, '"the court may treat it as waived, and pass it without consideration."'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.) We therefore do not consider these contentions.

intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) "In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*Ibid*.)

To the extent any error occurred in Deschamps's cross-examination, it was invited. The Attorney General relies on *People v. Penunuri* (2018) 5 Cal.5th 126 (*Penunuri*), in which the defendant was charged with crimes relating to multiple incidents. An accomplice, Delaloza, had already been convicted of crimes committed in two of those incidents; his appeal was pending. (*Id*. at p. 156.) Delaloza was supposed to testify at the defendant's trial, but after arriving at court he invoked his right to remain silent. (*Ibid*.) Following a discussion, the court agreed to play a recording of Delaloza's interview with police. (*Id*. at p. 154.) "[T]he defense asked the trial court to inform the jury that Delaloza 'has been convicted in this case, so that they can properly judge his testimony.' The court agreed and informed the jury that Delaloza had been convicted" of the other crimes, and that his appeal was pending. (*Id*. at p. 156.)

In the Supreme Court, the defendant asserted that the trial court erred in disclosing to the jury that Delaloza had been convicted in relation to two of the incidents. (*Penunuri, supra*, 5 Cal.5th at p. 157.) The defendant argued that "revealing an accomplice's conviction or guilty plea can at least under some circumstances be error, 'tantamount to inadmissible hearsay evidence.'" (*Ibid*.) The Supreme Court rejected this contention: "Assuming it was error, the error was invited. As noted, it was

19

defense counsel who requested that the jury be told about Delaloza's convictions 'so that they can properly judge his testimony.' Thus, counsel made a strategic judgment that the revelation of Delaloza's convictions would more likely benefit than harm his client by impeaching Delaloza's credibility. Because any error was invited by the defense, it cannot now be asserted as a basis for relief." (*Ibid*.)

The Court of Appeal reached a similar conclusion regarding invited error in *People v. Williams* (2009) 170 Cal.App.4th 587 (*Williams*). In that case, police went to a house to serve an arrest warrant on the defendant. Six other people were inside the house at the time of the arrest. During a search of the house, officers found methamphetamine, drug paraphernalia, weapons, and ammunition. (*Id*. at p. 596.) Defense counsel told the jury in opening statements that 10 people had been at the house on the day of the search; all of them had access to and could have possessed the guns and methamphetamine. (*Id*. at p. 619.) During various cross-examinations, defense counsel elicited the opinions of four police officers that the drugs and guns belonged to the defendant. (*Ibid*.)

On appeal, the defendant argued it was error to admit the testimony of the four officers "about who possessed the guns, drugs, and ammunition found" at the house. (*Williams, supra*, 170 Cal.App.4th at p. 618.) The Court of Appeal found that any error was invited: "As set forth above, the testimony about which defendant now complains was elicited by his own counsel. Thus, any error was invited, and defendant may not challenge that error on appeal." (*Id*. at p. 620; see also *People v. Bell* (2020) 47 Cal.App.5th 153, 193 ["any *Sanchez* error was invited because the

20

challenged testimony was elicited by [the defendant's] own lawyer"].)

Defendant urges us to follow *People v. Arends* (1957) 155 Cal.App.2d 496 (*Arends*), but the circumstances of that trial were different. In *Arends*, the deputy district attorney who initially planned to try the case, Ritzi, instead was called "as a witness on behalf of the People and testified concerning an offer made by appellant to plead guilty." (*Id.* at p. 506.) On cross-examination, defense counsel asked Ritzi about refusing to accept the defendant's guilty plea and deciding to take the case to trial instead. Ritzi testified, "From my examination of the file, from my talks with [the unrepresented defendant], and from my talks with the investigators, *it was my considered opinion that the defendant was guilty*." (*Id.* at p. 507 [emphasis in *Arends*].)

The Court of Appeal found the admission of Ritzi's testimony to be erroneous, and no "admonition the court could have given to the jury could have effectively removed the prejudice engendered by the testimony of the deputy district attorney that he had 'studied' the case, 'was prepared to try it', and was 'convinced' that appellant was guilty." (*Arends, supra,* 155 Cal.App.2d at p. 508.) The People argued the error was invited, because the most prejudicial testimony had been elicited by defense counsel on cross-examination. The Court of Appeal rejected this contention: "That such testimony was immaterial and highly prejudicial is manifest. Therefore, the argument that [the defendant's] counsel 'opened the gates' is unavailing. . . . Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or

21

irrelevant testimony. The so-called "open the gates" argument is a popular fallacy." (*Id.*, at pp. 508-509.)

Here, the prosecution did not introduce improper testimony, as in *Arends*, that defense counsel later explored in further depth on cross-examination. Instead, as in *Penunuri, Williams,* and *Bell*, the purportedly improper testimony was elicited by defense counsel alone when she asked Deschamps how he received certain information, and then questioned him about the source of that information.

Defendant asserts that the question—"How do you know [the gun] was there for approximately a day?"—did not call for hearsay. He contends "the question is of the type that obviously asks [Deschamps] to explain how he obtained personal knowledge; the question does not ask about what someone else knows, and was not an invitation to extemporize on inadmissible secret evidence and witnesses." We disagree. On cross-examination defense counsel focused heavily on establishing that Deschamps *did not* have personal knowledge about who placed the gun in the desk or when it was placed there. In addition, defense counsel knew from pretrial discussions and Deschamps's direct testimony that LASD obtained and executed the search warrant based on information from a confidential informant. Nevertheless, defense counsel asked Deschamps *how* he knew the gun had been in the desk for only a short time. It was foreseeable that Deschamps's response would be based on information received from the confidential informant. To the extent defendant now asserts the response to this question included inadmissible hearsay, any error was invited.

The same rationale applies to defense counsel's continued attempts to question Deschamps about the confidential

informant.  Defendant argues that Deschamps "testifie[d] to secret evidence by multiple secret sources and refuse[d] to even identify those sources, implying danger."  In fact, Deschamps did not testify about the sources of LASD's information; each time defense counsel attempted to question Deschamps about the confidential informant, the trial court intervened to bar the line of questioning.  To the extent any inadmissible information reached the jury as a result of this questioning, it was invited error.

Defendant further asserts that the trial court erred when it "protected the secrecy of the source without so much as a hearing on disclosure."  He also argues that "this information, which inculpates Mr. Talamantes[,] should have been provided in discovery" under section 1054.1.  Not so.  Under certain circumstances, the identity of a confidential informant is privileged.  (Evid. Code, § 1041.)  When "a party demands disclosure of the identity of the informant on the ground the informant is a material witness on the issue of guilt, the court shall conduct a hearing at which all parties may present evidence on the issue of disclosure."  (Evid. Code, § 1042, subd. (d).)  Defendant does not dispute that any information regarding the confidential informant met the privilege requirements.  In addition, he does not assert that the informant was a material witness on the issue of guilt, and nothing in the record suggests that defendant sought this information before or during trial.  We find no error in the court's rulings limiting defense counsel from asking about the confidential informant.

Moreover, to the extent any error occurred, it was harmless.  (See *People v. Duarte* (2000) 24 Cal.4th 603, 619 [the harmless error standard of *People v. Watson* (1956) 46 Cal.2d

23

818, 836-837 applies to state law error in the admission of hearsay].) There was ample evidence supporting the jury's conclusion that the firearm and other contraband were in defendant's possession. Deschamps testified that the desk in suite 202 displayed multiple signs referring to "Slayer," defendant's moniker, including one placard referring to him as the "General Manager." Defendant's EBT card was also found in the desk. In the ceiling, accompanying the bag of methamphetamine, there was a lighter with "Slayer" engraved on it. Defense witness Lomeli testified that defendant acted as a manager in the building, and suite 202 contained the materials he used in that role. The jury was shown multiple photographs of the evidence, as well as the firearm itself. Defense counsel had ample opportunity to argue that others had access to suite 202 and could have placed items there. This was not a case of "weak inference," as defendant asserts. It is not reasonably probable that the exclusion of Deschamps's statement about the firearm would have led to a different result, and therefore any error in admitting Deschamps's statements was harmless.[4]

C.    *Presentence custody credits*

Defendant asserts he is entitled to receive one additional day of presentence custody credit. The Attorney General agrees. At the time of sentencing, defendant was given 428 days of custody credit. A defendant is entitled to actual time credits both for the day of arrest and the day of sentencing. (See *People v.*

_____

[4] Defendant also asserts that to the extent any hearsay objection is deemed forfeited as a result of defense counsel's failure to articulate the basis of her objection, that forfeiture constituted ineffective assistance of counsel. Because we do not make a determination of forfeiture, we do not address this argument.

*Browning* (1991) 233 Cal.App.3d 1410, 1412; *People v. Smith* (1989) 211 Cal.App.3d. 523, 526.)  The parties agree that defendant was arrested on September 11, 2018, and sentenced on November 13, 2019—a total of 429 days.  Defendant is therefore entitled to one additional day of custody credit.

D.    *Imposition of fines and fees*

At the time of sentencing, the court imposed a restitution fine of $400 (§ 1202.4), criminal conviction facilities assessment fees totaling $90 (Gov. Code, § 70373), court operations assessments totaling $120 (§ 1465.8, subd. (a)(1)), and a crime lab fee of $50 (Health & Saf. Code, § 11372.5).  The court also imposed and stayed a parole revocation fine of $400.

Defendant asserts the trial court erred in imposing these fines and fees without holding a hearing as to defendant's ability to pay them.  Defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), in which Division Seven of this court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines and fees.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)  The Attorney General asserts that defendant forfeited the issue by failing to object to the imposition of the fines and fees in the trial court.  We agree.

The *Dueñas* opinion was issued on January 8, 2019.  Defendant was sentenced in November 2019, but he did not object on *Dueñas* grounds.  Defendant argues that his contention has not been forfeited, because under *Dueñas*, "the government must find an ability to pay before imposing a fine."  *Dueñas* does not so hold.  Division Seven, which decided *Dueñas*, has stated, "Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees

25

and assessments to be imposed. . . ." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*), ["It is the defendant who bears the burden of proving an inability to pay"], rev. granted Nov. 13, 2019, S257844.[5])  Defendant's failure to object on the basis of *Dueñas* forfeited his challenge.

Even before *Dueñas*, defendants had a statutory right to challenge the imposition of a restitution fine exceeding the statutory minimum of $300.  Under section 1202.4, a defendant's inability to pay "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $ 300]." (§ 1202.4, subd. (c).)  Here, the court imposed a $400 restitution fine, and defendant did not object on the basis that he was unable to pay the fine or that he was entitled to present evidence on his ability to pay.  "Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154, citing *People v. Avila* (2009) 46 Cal.4th 680, 729.)

Moreover, because defendant did not object to the $400 restitution fine based on his inability to pay it, "he surely would not complain on similar grounds regarding an additional [$260] in fees." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Because defendant did not object to the imposition of fines or fees

---

[5] According to the Supreme Court's website, in *Kopp* the court limited review to the following issues:  "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  (2) If so, which party bears the burden of proof regarding the defendant's inability to pay?"

based on his inability to pay them, his appellate challenge on this basis has been forfeited.[6]

## DISPOSITION

The judgment is modified to add one day of presentence custody credit, for a total of 429 actual days.  In all other respects the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting the modified presentence custody credit and forward a copy to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.

---

[6] Defendant contends that he may assert this argument for the first time on appeal, citing an unpublished case from 2010. This authority does not support defendant's contention; an opinion "that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action."  (Cal. Rules of Court, 8.1115(a).)

27